**UNITED STATES of America**
**v.**
**Joseph Louis LANZA et al.**
**Crim. No. 71–83.**

United States District Court,
M. D. Florida,
Orlando Division.

May 24, 1972.

Memorandum Opinion May 30, 1972.
As Amended Jan. 11, 1973.

See also D.C., 349 F.Supp. 929.

**28**

Bernard H. Dempsey, Jr., Asst. U. S. Atty., Tampa, Fla., for plaintiff.

Walter G. Arnold, Jacksonville, Fla., and Edwin C. Cluster, Ocala, Fla., for Roy Thaggard Boyd.

Donald R. Corbett, Orlando, Fla., for Donald Miles.

Clinton A. Curtis, Jack P. Brandon, Lake Wales, Fla., for Vincent M. Razzano.

Leo W. Haley, Orlando, Fla., for James C. Britt, Peggy Ann Britt and Carrie Wise.

Edward R. Kirkland, Orlando, Fla., for Lee Massey, and William Anderson Fox.

Richard C. Langford, Lakeland, Fla., for Lillian Lockett, Janie Simon, Lee Lockett, Leroy Johnson, Mary Williams, Catherine Williams, Thelma McClary, James Ned Weaver, Gertrude Norman, Leola Ellis, Margaret Pressley, Joe Glover, Ruth Glover, Lula Mae Giles, Maggie Smith, Eddie Holland and John Ray Simon.

Arnold D. Levine, Tampa, Fla., for John Newton Fountain.

David M. Porter, Orlando, Fla., for Ida Wall Silas, James Crabtree, Samuel Eugene White, William Ralph Strawder, Eloise Graham, Eddie Mitchell and Louis Constantino.

Frank Ragano, Tampa, Fla., for Joe Louis Lanza and Anne Fusco.

Richard S. Rhodes, Orlando, Fla., for Morris Engle, Richard Mercier, and Charles Edward McCuen.

James M. Russ, Orlando, Fla., for Donald B. Smith.

Michael Sigman, Orlando, Fla., for Morris Solomon Bort, Ester Cobbin McGee and Louis B. Pacheco.

Dan R. Warren, Daytona Beach, Fla., for John Narducci and Bruce O'Malley.

Andrew A. Welch, Orlando, Fla., for Henry A. Finkelstein, Matthew Smith, Frank Del Rosso, Robert Steve Shellhorn, Orville Johnson, III, and Larry Gonzales.

## ORDER

TJOFLAT, District Judge.

During the course of the trial of this case, the government called as one of its principal witnesses, Beverly Roberts Matthews. She testified at great length and in great detail concerning the Harlan Blackburn gambling operation, the subject of this prosecution. One of the things developed during her cross-examination was that she had gone to the Federal Bureau of Investigation and offered her services as an informant at a time when the Florida Department of Law Enforcement (F.D.L.E.) was conducting court-ordered wiretaps in the investigation of the case. In consequence of this disclosure, counsel for defendant John Newton Fountain renewed his motion to suppress all the wiretap evidence[1] in the case on the ground that there had been no need for the wiretap surveillance pursuant to 18 U.S.C. § 2518. That section requires that "normal investigative procedures have been tried and have failed" before a wiretap warrant can issue.[2]

1. The Court previously denied the defendant's motion to suppress wiretap evidence on multiple grounds. United States v. Lanza, 349 F.Supp. 929 (M.D.Fla.1972); United States v. Lanza, 341 F.Supp. 405 (M.D.Fla.1972).

2. 18 U.S.C. § 2518. Procedure for interception of wire or oral communications
    (1) Each application for an order authorizing or approving the interception

of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
    *       *       *       *       *
    (c) a full and complete statement as to whether or not other investigative pro-

Out of the presence of the jury, the Court conducted a hearing on the availability of Mrs. Matthews as a witness at the time of the wiretap applications, especially the application to monitor the Fox telephones, the last intercept made. The Court heard Mrs. Matthews; the prosecutor, Assistant United States Attorney Bernard Dempsey; and Special Agent Phillip Smith of the F.B.I. Their testimony revealed that Mrs. Matthews had been convicted of perjury in Orlando, Florida, in February, 1971. The perjury occurred in a grand jury investigation of the organized gambling activities involved here. In July, 1971, after the conclusion of the perjury prosecution, she went to Special Agent Smith in an effort to clear her conscience. Mrs. Matthews had been Harlan Blackburn's personal secretary and confidant and had witnessed or participated in much of the high level functioning of his organization for several years. Agent Smith subsequently advised Prosecutor Dempsey that she was divulging information about the Blackburn operation.

The monitoring in this case began on May 12, 1971, and continued through October, 1971, when the last tap was terminated and the arrests of the defendants were made. During the course of the monitoring, the F.B.I. and the United States Attorney's Office were aware that the F.D.L.E. was conducting an intensive investigation into organized gambling in the central Florida area. In fact, an F.B.I. informant had furnished part of the information leading to the issuance of one of the wiretap warrants. However, the F.D.L.E. made no progress reports to the F.B.I. or any other federal agency; and those agencies were neither aware of nor participated in any facet of the investigation until September, 1971. In that month the F.D.L.E. approached Dempsey to inquire whether the United States could undertake the prosecution of the case then under F.D.L.E. investigation. At this time Beverly Roberts Matthews was not a potential witness. For, had it been known to those involved in the organized criminal activity that she had been "talking" to the F.B.I., her life would have been seriously endangered. Even without disclosing her identity as an informant, it was eventually necessary for the government to place her in the protective custody of the United States Marshal. Her situation was so sensitive that it would have been unconscionable for Agent Smith or Prosecutor Dempsey to have disclosed her name and the information she was giving to the F.D.L.E. or anyone else during the pendency of the monitoring in question.

It was not until after the wiretaps were concluded and the United States Attorney's Office had assumed jurisdiction of this case that the possibility of testifying was even mentioned to Mrs. Matthews; and the decision to call her as a witness was not made until late in the preparation for trial. In fact, it was not until the very eve of trial that the F.D.L.E. learned she was to testify. To suggest that she was a viable prosecution witness for the F.D.L.E. in September and October, 1971, when the last wiretap application to Florida Supreme Court Justice James C. Adkins was made, is unrealistic.

The defendants contend that the Court should impute to the F.D.L.E. whatever knowledge the F.B.I. might

cedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

\* \* \* \* \*

(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that—

\* \* \* \* \*

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

have obtained from Mrs. Matthews or, conversely, find that the F.B.I. had a duty to disclose to the F.D.L.E. any information it may have had in its files concerning the Blackburn organization. Thus, F.D.L.E.'s failure to advise Justice Adkins of her availability as a witness and the information she had given vitiates the efficacy of the warrant. As a blanket proposition, such a rationale would not only be unwieldy, but undesirable. Under the circumstances in this case, the Court cannot adopt such a rule. Even supposing that an informant is actually available to an investigating agency and willing to testify, there still may be a valid need for wiretap evidence.[3] United States v. Leta, 332 F.Supp. 1357 (M.D.Pa.1971). The purpose of the exhaustion requirement is not to foreclose the use of electronic surveillance until the state has exhausted every possible means of obtaining a viable case against the subjects, but merely to inform the authorizing magistrate or judge of the nature and progress of the investigation and the difficulties inherent in the use of normal techniques. 1968 U.S. Code Congressional & Administrative News 2190; United States v. King, 335 F.Supp. 523 (S.D.Cal.1971). The difficulties inherent in this case are obvious from the sheer magnitude of the organization involved. Sixty defendants, with widely varying roles in the organization, were originally indicted.[4] The defendants do not contend that the informants who supplied information of isolated instances of wagering knew everything about the overall operation of the business or that anyone can be pointed to who was familiar with or even knew every defendant. In fact, Mrs. Matthews, who obviously knew a great deal about the business, was acquainted with only one of the four defendants on trial. As to many of the defendants, the only incriminating evidence was that obtained from the wiretaps.

■ Under these circumstances, the Court concludes that Mrs. Matthews' cooperation with the F.B.I. was not attributable to the F.D.L.E. and in no way impairs the legal sufficiency of the applications and interception orders in this case. It is, therefore

Ordered that the defendants' motion to suppress the evidence in this case is denied.

## MEMORANDUM OPINION

### ON OBJECTION TO PROPOSED TESTIMONY

During the trial of this case, the defendant John Newton Fountain advised the Court that as a part of his defense he proposed to offer expert testimony on the results of a polygraph examination that had been administered to him. The government objected to the admission of any evidence relating to the polygraph test, citing numerous decisions on the subject and noting that no federal court has admitted the results of a polygraph examination.

■ In United States v. Chastain, 435 F.2d 686, 687 (7th Cir. 1970), and United States v. Wainwright, 413 F.2d 796 (10th Cir. 1969), both cited by the government, the refusal to admit the polygraph results were based on the failure of the proffering party to lay a proper foundation for the testimony. In each instance, the Court noted that, given an adequate foundation, it would be within the discretion of the trial judge whether to receive such evidence. The Court views this, rather than the *per se* rule urged by the government, to be the correct approach to the question of admissibility.

3. The defendants have already raised this objection with respect to other informants who provided information used to establish probable cause for the initial wiretap applications. United States v. Lanza, 349 F.Supp. 929 (M.D.Fla.1972).

4. Of the sixty original defendants, one died, one was dismissed, three were severed and await trial and fifty-two pleaded guilty—over forty of those on the morning of trial. Only four defendants actually went to trial, at which Mrs. Matthews testified.

In an effort to establish a predicate for the results of the polygraph examination, defendant Fountain proffered the testimony of John E. Reid of John E. Reid & Associates, Chicago, Illinois. Reid is generally acknowledged as a leading authority in his field and has written numerous scientific and legal articles.

The polygraph itself is a medical device which measures and records blood pressure, pulse rate, respiration, galvanic skin response, air displacement, and muscular contractions. At one time, Reid was of the opinion that the results of such testing should not be admitted in a judicial proceeding. By 1966, however, he began advocating the acceptance of polygraph tests as reliable scientific evidence. Although the basic polygraph apparatus has not changed, Reid now suggests that the experience, competency, and reliability of the polygraph examiners has so improved as to qualify them to administer examinations fully acceptable to the courts. Moreover, there are organizations, such as the American Academy of Polygraph Examiners and the American Polygraph Association, which endeavor to establish and maintain professional standards for examiners.

Reid testified that he has personally conducted at least 25,000 polygraph examinations and has supervised the administration of another 75,000 exams. Of all cases studied, 10% are unintelligible, inconclusive, and impossible to interpret, 25% are obvious cases and can be easily interpreted, and the remaining 65% are the hard cases which can be properly interpreted only by a qualified examiner. Based on the documented performance of qualified examiners in this 65% group and other test cases, Reid can demonstrate examiner error in only one-tenth of 1% of all cases. However, to be on the safe side, he projects a maximum possible rate of error of 1%.

The defendant Fountain was examined by Reid on May 3, 1972, in Reid's Chicago office. After a few preparatory questions, Fountain was asked two questions concerning his involvement in this case. He gave "clouded responses." Reid did not explain whether this meant the defendant was apprehensive about the questions or simply did not understand them. In any event the questions were rephrased in language chosen by the defendant himself. On the basis of the response to the redrafted questions, Reid concluded that Fountain told the truth when he denied participating in the Blackburn gambling operation.

There is strong evidence in this case that Fountain was one of the financiers who loaned money to Blackburn at substantial rates of interest. The interest, or "juice", was paid at the rate of 10% per month. The evidence of Fountain's involvement included, for example, taped telephone conversations about a $30,000 loan for which Fountain was to receive $3,000 for one month's interest. The evidence also disclosed a meeting between Blackburn and Fountain at which the proceeds of a sizeable loan changed hands, and it was indicated that Blackburn needed the money to pay gambling losses.

When the polygraph examination was administered none of this information, was made available to Reid and he knew none of the details of Blackburn's operation. Reid did have a copy of the indictment, but was aware only that Fountain was charged with making the loans to Blackburn. The questioning of the polygraph examiner boiled down to: "Did you give money to Harlan Blackburn for the operation of illegal gambling activities?" That is the question that prompted the clouded response. When the defendant suggested rephrasing. the question to: "For illegal gambling purposes, did you give money to Harlan Blackburn?", Reid complied. No questions were put to Fountain about the $30,000 loan he had discussed in telephone conversations that had been recorded and would be introduced in

evidence. Nor did Reid inquire about any other loans to Blackburn which—the evidence would disclose—were made by Fountain.

Fountain's substituted question is as ambiguous, if not more so, than the question Reid originally posed. It is a mixed question of law and fact. The whole theory of lie detection by polygraph examination is that the suspect's apprehension of the truthful answer to a particular question can be detected. In this instance, the question called for the defendant's definition of "illegal gambling purposes" and left room for doubt as to whose purpose was being questioned. Moreover, the thrust of the query was whether the defendant "gave" any money to Blackburn, not whether he "loaned" any money. Reid admitted that the defendant voiced concern about the original questions by stating: "I did loan the money to him, but I didn't do it for gambling purposes or illegal purposes." Query what the responses would have been had the polygraph examination touched upon the incriminating evidence that Fountain knew was certain to be produced at the trial.

On cross-examination Reid admitted that in his book, *Truth and Deception*, it is stated that an examiner ought to have all the available facts and circumstances giving rise to the charge against his subject before administering a lie detector test. He acknowledged that this would be good practice in determining the guilt or innocence of a police suspect submitting to a polygraph test. Yet he contended that such an investigation was unnecessary in Fountain's case. He even suggested that a re-examination of Fountain, in the light of the evidence now disclosed, would not alter his opinion.

The defendant's proffer was not sufficient to justify the admission in evidence of the results of the polygraph examination; and the government's objection to its introduction was well taken. It is, therefore

Ordered that the government's objections to Reid's proposed testimony is sustained.