**UNITED STATES of America**

**v.**

**Carmelo Frank CURRERI, Jr., et al.**

**Crim. 73-0463-M.**

United States District Court,
D. Maryland.

Dec. 3, 1974.

George Beall, U. S. Atty., and William A. Pope, David M. Soutar and Robert B. Schulman, Sp. Attys., U. S. Dept. of Justice, Baltimore, Md., for plaintiff.

William Greenfeld, Baltimore, Md., for defendants Carmelo Frank Curreri, Jr., and Samuel Joseph Curreri.

Arnold M. Weiner, M. Albert Figinski and Peter Max Zimmerman, Melnicove, Greenberg & Kaufman, P.A., Baltimore, Md., for defendant Milton Baumel.

Russell J. White and Robert N. Dugan, Towson, Md., for defendant Alvin J. Hollander.

Jerome Blum, Baltimore, Md., for defendant John David Matthews.

James R. White, Baltimore, Md., for defendant Carmelo Frank Curreri, Jr.

H. Russell Smouse and Walter E. Black, Jr., Baltimore, Md., for defendant Francis X. Alagna.

Phillip M. Sutley, Baltimore, Md., for defendants Salvatore Sebastian D'Anna, Melvin K. Smith, Carlo Samuel Bucci and Acme News Services, Inc.

JAMES R. MILLER, Jr., District Judge.

### OPINION AND ORDER

Pursuant to 18 U.S.C. § 2518(10)(a), defendants have moved to suppress all evidence obtained against each of them as a result of electronic interception or eavesdropping, under the authority of an order dated January 31, 1973, signed by Judge Kenneth C. Proctor of the Circuit Court for Baltimore County. This order purported to allow the interception of wire or oral communications transmitted or received over telephone Nos. 866–1966 and 866–5491.

Four reasons are assigned for the proposed suppression. They are as follows:

"1. The state authorized wiretap in this case contravened the prohibition of the Fourth Amendment to the Constitution of the United States against unreasonable searches and seizures and did not satisfy federal statutory standards, particularly Section 2516(2) of Title 18, U.S.C., which control electronic surveillance of telephone conversations.

"2. If the Maryland statutes authorizing wiretaps are valid, their provisions 'more restrictive' than federal law compel suppression of the intercepted communications as evidence in these proceedings because the prosecution here is brought in a forum and for violations not contemplated by Maryland law.

"3. The application and affidavit filed to obtain the Order for electronic surveillance in this case fail to establish probable cause as required by the Fourth Amendment to the Constitution of the United States and by 18 U.S.C. § 2518(1) and (3).

"4. The application, affidavit and order for electronic surveillance in this case each failed to contain that full and complete statement, required by 18 U.S.C. § 218 [2518](1)(c) and (3)(c), demonstrating that other investigative techniques had been tried and failed and why such other procedures reasonably appeared to be dangerous or unlikely to succeed if tried. The conclusory statement in this regard by the State's Attorney violates Maryland law."

*I.*

*a.*

The defendants first challenge the validity of the statutory basis for the

wiretap. The wiretap itself was conducted by Baltimore County police officers between February 3, 1973, and February 7, 1973. On February 7, 1973, Judge Proctor ordered that the contents of the intercepted wire communications be disclosed to investigative and law enforcement officers of the United States for use in any proceedings held under the authority of the United States.

Judge Proctor's order of January 31, 1973, originally authorizing the wiretap, recites that said power is authorized by "the provisions of Article 27, Section 125A, Article 35, Section 92 thru 99, of the Annotated Code of Maryland, 1957 Edition, as amended and revised, pursuant further to the Omnibus Crime Control and Safe Streets Act of 1968, and further pursuant to the Fourth Amendment to the Constitution of the United States of America. . . . "

While defendants do not concede the constitutionality of the 1968 Act, they do admit that challenges to the Act "have not been generally successful." The Fourth Circuit has unequivocally upheld the constitutionality of Title III of the 1968 Act and, more specifically, 18 U.S.C. §§ 2515–2520. United States v. Bobo, 477 F.2d 974, 981–982 (4th Cir. 1973). This court has held likewise, United States v. Focarile, 340 F.Supp. 1033, 1037–1038 (D.Md.1972). *See also* United States v. Chavez, 416 U.S. 562, 94 S.C. 1849, 40 L.Ed.2d 380 (1974).

The thrust of this contention by defendants is that in the absence of a state statutory authority for electronic interception which *itself* sets forth the minimum standards for compliance with the Fourth Amendment, the 1968 Act allows no state wiretapping. In support of this contention, defendants rely on 18 U.S.C. § 2516(2), which provides:

"(2) The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is *authorized by a statute of that State* to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter *and with the applicable State statute* an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, *designated in any applicable State statute authorizing such interception,* or any conspiracy to commit any of the foregoing offenses." (Emphasis supplied).

Defendants urge that the "clear language" of this subsection makes a state statute which (a) authorizes interception, (b) sets standards for obtaining and conducting interception, and (c) designates offenses subject to interception, a prerequisite to a valid state-conducted wiretap. Defendants further point out that the Maryland statutes which purport to authorize wiretaps (Md.Ann.Code art. 27, §§ 125A–125D and art. 35, §§ 92–99) [1] were enacted

---

1. Subsequent to the wiretaps and the disclosure order of Judge Proctor in this case, the Maryland General Assembly, as a part of the process involved in a general recodification of Maryland law now under way, reenacted art. 35, § 92 et seq., subtitle "Wire Tapping," in substantially the same language as it formerly appeared. Laws of Maryland, 1973, 1st Special Session, Ch. 2, § 1. The recodified statute, which became effective on January 1, 1974, is now designated as Md.Ann. Code, Cts. & Jud.Proc. Art., §§ 10–401—10–408 (1974). Although the General Assembly rejected efforts of the Commission to Revise the Annotated Code to have certain parts of the statute substantively rewritten in the process of recodification (*see* Adkins, "Code Revision In Maryland," 34 Md.L.Rev. 7, 46–

prior to the decision of Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L. Ed.2d 1040 (1967), and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967), in which the Supreme Court enunciated its view of what procedural safeguards are required before wiretap evidence may be admitted in a criminal trial.

Defendants contend that the Maryland statutes authorizing wiretaps do not meet the constitutional standards set by *Berger* and *Katz* and incorporated in Title III. They allege that these statutes are deficient in numerous respcts, including, *inter alia,* the failure to set forth "minimization standards" the lack of a requirement of post-recording notice to persons in whose names the tapped telephone lines are listed, and the absence of a requirement that the application or order particularize the conversations to be recorded or identify the person or persons, if known, whose communications are to be intercepted.

The Government does not argue that the Maryland wiretap statutes, standing alone, comply with all the constitutional requirements laid down in *Berger* and *Katz.* Rather, the Government relies on the view of the Maryland Court of Appeals in State v. Siegel, 266 Md. 256, 292 A.2d 86 (1972), in which the court stated:

"Having determined that Title III is not violative of the Fourth Amendment, it is now necessary to evaluate whether it can be implemented in Maryland. It is abundantly clear that *the federal act is not self-executing as applied to the states.* Under § 2516(2), the principal prosecuting attorney of any state or political subdivision, if *'authorized by a statute of that State',* may apply 'to a State court judge of competent jurisdiction for an order authorizing' the interception of wire or oral communications. (Emphasis added.) That section also

states that the issuing judge may grant the order 'in conformity with section 2518 of this chapter and with the *applicable State statute . . . .*" (Emphasis added.) However, while Title III requires an appropriate state act before it can be effectuated, under no circumstances is that law enforceable if it is less restrictive than the federal statute so that it grants the governing power more rights at the expense of its citizens. In this vein § 2515 mandates that evidence obtained by the interception of wire or oral communications, in violation of the Crime Bill, cannot be received in evidence in any court, federal or state. *Of course, a state act which is more closely circumscribed than the federal law in granting eavesdrop authority is certainly permissible.* Robert v. State, 220 Md. 159, 168–169, 151 A.2d 737 (1959).

"The Maryland statutes concerned with the interception of wire or oral communications are Code (1957, 1971 Repl.Vol.), Art. 27, §§ 125A–D, and Code (1957, 1965 Repl.Vol.), Art. 35 §§ 92–99. They provide that upon application from the proper state official, a judge of the circuit court of any county or of the Supreme Bench of Baltimore City may issue an order allowing the interception. (In both articles the State's Attorney is competent to apply but while Art. 35, § 94(a) permits such a petition from the Attorney General, a similar stipulation is not included in Art. 27, § 125A(b)). *These provisions are 'applicable State statute[s]' as envisioned under § 2516(2) and whether each of their terms relating to the application or grant of an order is constitutional* vel non *is of no consequence. Once the hurdle of finding an applicable Maryland law authorizing interception is overcome, compliance must be had with whichever law is more constricting, be it federal or state.*

47 (1974), a substantive change was made in former art. 35, § 97, now Md.Ann.Code, Cts. & Jud.Pro. Art., § 10–406 (1974). This

change will be discussed in Part II of this opinion.

"We find that not only is Title III constitutional, but it may be properly implemented in this State." (Emphasis supplied).

266 Md. at 271–272, 292 A.2d 86, at 94–95.

The issue raised by defendants is one of first impression in Federal courts. No federal court has yet had to decide the validity of a state-ordered, authorized-, and conducted-wiretap where the Government has conceded that the *state's* wiretap law may not meet all constitutional requirements but contends that all constitutional requirements were complied with in fact, as required by Title III.

Without doubt, Maryland has statutes which authorize, or purport to authorize, a State's Attorney to apply for a state court order permitting electronic interception.[2] The two Maryland statutes, even when read together, do not meet or contain standards and procedures at least as restrictive as Title III, a fact which defendants argue makes any wiretap thereunder fatally defective. This view is lent some support by the statement in Senate Report No. 1097, 90th Congress, 2nd Session, 1968, U.S. Code Congressional & Admin.News, p. 2187, that:

> "*The State statute must meet the minimum standards reflected as a whole in the proposed chapter.* The proposed provision envisions that States would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation." (Emphasis supplied).

In United States v. Tortorello, 480 F. 2d 764 (2d Cir. 1973), the court was dealing with a state-authorized and conducted-wiretap and the newly enacted New York wiretap statute which virtually tracked the language of Title III. In upholding the validity of that wiretap, the court stated:

"Section 2516(2) requires that a state statute authorizing the interception by law enforcement officers of wire or oral communications must contain certain minimal safeguards, in conformity with Section 2518, against intrusion upon rights protected by the Fourth Amendment.

\* \* \* \* \* \*

"The state statute [New York's] clearly conforms to the Act with regard to the procedures for obtaining a valid order. If it did not, the order of course would be unlawful even though authorized by state law."

Id., 480 F.2d at 771–772.

Since the Second Circuit was not faced with the same problem confronted here, it may have been unduly broad in its language.

■ Recent decisions of the Supreme Court interpreting Title III reflect the Court's current view that the severe sanction of the exclusionary rule will not be applied to exclude wiretapped material in all situations in which a noncompliance with the literal language of Title III occurred. United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974); United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1850, 40 L.Ed.2d 341 (1974). Where, for instance, the violation of Title III consisted of a failure to adhere to a portion of the Act designed simply as a " . . . reporting function . . . to establish on paper that one of the major procedural protections of Title III had been properly accomplished . . ." rather than a failure to abide by a portion of the Act intended " . . . to occupy a central or . . . functional, role in guarding against unwarranted use of wiretapping or electronic surveillance . . .," the exclusionary rule will not be applied. United States v. Chavez, supra, 416 U.S. at 578, 579, 94 S.Ct. 1849, at 1857. This view of the intent of Congress in Title III provides some guidance in unrave-

---

2. Art. 27, §§ 125A–125D, Md.Code Anno. (1971 Repl.Vol.) and former Art. 35, §§ 92–99 Md.Code Anno. (1971 Repl.Vol.), now Md. Ann.Code, Cts. & Jud.Proc. Art., §§ 10–401—10–408 (1974). See footnote 1 *supra.*

ling Congressional intent in adopting that part of Title III now codified as 18 U.S.C. § 2516(2).

Section 2511 of the 1968 Act prohibits as unlawful *any* wiretap [3] in violation of the provisions of Title III. Section 2515 prohibits the use as evidence ". . . in or before any court . . . of . . . a State or a political subdivision thereof . . ." of material obtained from electronic surveillance where ". . . the disclosure of that information would be in violation of . . ." Title III. Section 2516(2) provides that a state court judge may grant an order authorizing electronic surveillance "in conformity with section 2518 . . . *and* with the applicable State statute." (Emphasis supplied). Section 2518 then sets forth the various procedural and substantive requirements which the application for the court order, the court order itself, and the resulting electronic surveillance must meet.

The regulatory scheme which emerges from a reading of the Act is one which allows electronic surveillance to be conducted by state officials under state court order in accord with the minimum standards set forth in the 1968 Act provided that the State has authorized electronic surveillance at all. The State may establish more strict standards than the federal statute mandates, but may not utilize less restrictive standards.

■■ In summary, the 1968 Act, in strictly regulating the use by federal and state law enforcement officials of the techniques of electronic surveillance, allows States, which choose by legislative action so to do, to conduct wiretaps provided they are conducted in accord with minimum federal standards, unless the state legislature determines to adopt more strict standards in which event the more strict state standards apply. It follows that, so long as a state legislature has expressed its will by statute that designated state prosecuting attor-

neys be allowed to obtain from state courts permission for state investigative or law enforcement officers to engage in wiretapping or electronic surveillance, a state statute duplicating the words of Title III would not serve a ". . . central or . . . functional, role in guarding against unwarranted use of wiretapping or electronic surveillance. . . ." [4] since Title III itself provides the standards and procedures to fulfill that role. Only where the state legislature, as a condition of allowing wiretaps or electronic surveillance, desires to establish more strict standards than found in Title III would the detailing by the state statutes of those more rigorous conditions serve such "central or . . . functional, role. . . ." Therefore, this court holds that Title III does not require that Maryland adopt a statute tracking its provisions in order to validate evidentiary use of state-court authorized wiretaps otherwise obtained in compliance with the substantive provisions of Title III.

*b.*

The defendants contend, however, that a Maryland statute cannot validly authorize the issuance of state court electronic interception orders under the aegis of Title III unless the state statute designates the offences relating to which interception is permitted.

■ Section 2516(2) of Title III provides that a state court judge of competent jurisdiction may grant an order authorizing a wiretap:

". . . when such interception may provide . . . evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, *or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such*

---

3. There are certain enumerated exceptions not here relevant.

4. United States v. Chavez, *supra*, 416 U.S. at 579, 94 S.Ct. at 1857.

*interception*, or any conspiracy to commit any of the foregoing offenses." (Emphasis supplied).

There is no statutory enumeration or designation in Maryland of the crimes which may be the subject of electronic surveillance. State v. Siegel, 13 Md. App. 444, 462, 285 A.2d 671 (1971), aff'd, 266 Md. 256, 292 A.2d 86 (1972). The defendants' interpretation of the aforequoted portion of § 2516(2) of the 1968 Act is unduly restrictive, however. The correct interpretation in this court's view is that the offenses enumerated in § 2516(2) might be the subject of wiretap investigations, whether or not they are designated in the applicable state statute, but that any other offenses would have to be designated in the state statute in order to be so investigated.

No federal courts have yet directly confronted this issue. In Maryland, the Government's position is supported by State v. Siegel, *supra*, 13 Md.App. at 462, 285 A.2d 671, which states, in essence, that the only offenses subject to wiretap investigation in Maryland are those enumerated in the 1968 Act. The legislative history of the 1968 Act, although not altogether clear on this point, lends some support to the less restrictive interpretation. Senate Report No. 1097, 90th Cong., 2nd Session, 1968, U.S.Code Congressional & Admin.News, p. 2187, states:

> "The interception of wire or oral communications by State law-enforcement officers could only be authorized when it might provide, or has provided evidence of designated offences. (Citation omitted). Specifically designated offences include murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in . . . drugs. All other crimes designated in the State statute would have to be 'dangerous to life, limb, or property, and punishable by imprisonment for more than 1 year.' This limitation is intended to exclude such offenses as fornication and adultery, which do not involve danger to life, limb, or property. . . . Finally, any conspiracy to commit any of the designated offenses would warrant the issuance of an order."

The rationale set forth in Part *Ia.* of this opinion applies as well here. It would not serve any "central or . . . functional, role" in curbing unwarranted use of wiretapping or electronic surveillance to require the state statute to restate the crimes specifically named in Title III as appropriately being the subject of an investigation using wiretaps or electronic surveillance. Furthermore the Senate Report indicates that the intention of this provision of Title III was to limit a state in its power by state legislation *to add* to the list of crimes specifically enumerated in Title III as appropriate for such an investigation.

In accord with this court's view of the intent of Congress in enacting § 2516(2), I hold that the phrase therein, "designated in any applicable State statute authorizing such interception," modifies only the preceding phrase commencing "or other crime dangerous to life . . ." and not the offenses enumerated theretobefore.

The application of the State's attorney for the wiretap order in this case and the affidavits in support thereof alleged that there was probable cause to believe that the gambling laws of Maryland were being violated and that a conspiracy existed to violate such laws. Gambling is one of the "specifically designated" offenses in Title III. Therefore, the defendant's contention on this point is without merit.

## II.

The second prong of the defendants' attack is based upon the argument that a provision of the Maryland law, more restrictive than Title III, compels suppression of the wiretap evidence in these proceedings. This contention derives from former Art. 35, § 97 which provided:

> "§ 97. Admissibility of evidence. Only evidence obtained in conformity

with the provisions of this subtitle shall be admissible in evidence, *and then only* in a prosecution for the crime or crimes specified in the court order, in the circuit courts of this State or in the criminal courts of Baltimore City." (Emphasis supplied).

Effective January 1, 1974, this section, together with other sections of the Maryland wiretapping statute, was recodified [5] as Md.Ann.Code, Cts. & Jud. Pro.Art., § 10–406 (1974). That section provides:

"§ 10–406. Admissibility of evidence. Only evidence obtained in conformity with the provisions of this subtitle is admissible, *and then only in a prosecution for the crime or crimes specified in the order of court."*

(Emphasis supplied).

The recodified § 10–406 eliminated the prior language which seemingly previously limited the tribunals which might properly receive wiretap evidence under state court authorized wiretaps.[6] The recodification retained, however, the language purporting to allow wiretap evidence to be used "only in a prosecution for the crime or crimes specified in the court order."

The order of Judge Proctor, dated January 31, 1973, authorized the interception of telephonic communications *"dealing with violations of the gambling laws of the State of Maryland."* (Emphasis supplied). Of course, the indictment in this case charges the defendants with violations of federal law, specifically, 18 U.S.C. §§ 371 and 1955, not with violations of the gambling laws of Maryland.

As discussed in Part *Ia.* of this opinion, the legislative scheme of Title III is to enforce the more restrictive provisions of either Title III or of the state statute in the case of a wiretap or electronic surveillance conducted pursuant to a state court authorization. While a State may not adopt or utilize standards and procedures less strict than Title III, it may adopt and utilize standards and procedures more strict. The Maryland Court of Appeals has recognized this expression of the parameters of the limitations upon state court procedures imposed by Title III. State v. Siegel, 266 Md. 256, 272, 292 A.2d 86 (1972). The Second Circuit, the only federal court to mention the subject, has recognized in dicta in United States v. Manfredi, 488 F.2d 588 (2nd Cir. 1973), that the evidential validity in a federal court proceeding of the results of wiretaps obtained through state court wiretap authorizations will be subject to the more strict standard of the state statute rather than of the less strict substantive provisions of Title III in a case where the state statute is more restrictive. In *Manfredi,* Judge Oakes said for the court:

"While we encourage cooperation between federal and state law enforcement agencies, we note that the Government, in allowing a joint investigation to proceed through the use of a state warrant, subjects itself to the risk that state courts may impose on such warrants and the evidence obtained under those warrants a higher standard than would a federal court dealing with interpretation of the federal wiretap statutes."

*Id.* 488 F.2d at 598, n. 7.

■■■ The question remains, however, as to the area within which it was the intent of Congress in Title III to enforce and give federal effect to a more restrictive provision in a state wiretap statute. Succinctly stated, the question is whether a more restrictive state statutory provision relating to the authorization of, and procedures utilized in, the *interception* of wire or oral communications is treated differently in the Title III statutory scheme than a more restrictive state statutory provision relating to the authorization for *disclosure*

---

5. See footnote 1, *infra.*

6. In the view the court takes of this case, it is not necessary to decide the effect, if any, of this change in language.

*and use* of intercepted wire or oral communications. The court believes that the Congressional intent was to treat the two differently and that a more restrictive state statutory provision, dealing with *disclosure and use* of otherwise lawfully intercepted wire or oral communications, than the correlative provision of Title III is not to be given effect in a federal court proceeding. Since § 10–406 deals only with *disclosure and use* of communications intercepted by wiretap or electronic surveillance rather than with the authorization of, and procedures utilized in, the interception, § 10–406 does not compel suppression of the wiretap evidence in this case.

The reasons for the court's interpretation of Title III, reaching this result, are as follows. First, Title III itself treats the authorization for *interception,* 18 U.S.C. § 2516, in a different section from the authorization for disclosure and use of materials once intercepted, 18 U.S.C. § 2517.

Second, the language of Title III which has been seen as the basis for an interpretation of Title III that a state statute may be more restrictive than Title III[7] appears only in 18 U.S.C. § 2516(2). That language, in pertinent part, reads as follows:

". . . and such [State] judge may grant in conformity with section 2518 of this chapter and with the applicable State statute *an order authorizing, or approving the interception of* wire or oral communications . . . ." (Emphasis supplied).

That language *does not refer to a disclosure or use* of the intercepted communications.

Third, that part of Title III which does refer to disclosure and use of the intercepted communications, 18 U.S.C. § 2517, does not condition the applicability of its conditions to any standard external to Title III itself so long as the communications have been lawfully intercepted in accordance with the appropriate standards set forth in 18 U.S.C. §§ 2516 and 2518. Section 2517 provides in pertinent part:

"(3) Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom *intercepted in accordance with the provisions of this chapter* may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any *criminal proceeding in any court of the United States or of any State. . . .*

\*　\*　\*　\*　\*　\*

"(5) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used . . . . Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction *where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter.* Such application shall be made as soon as practicable." (Emphasis supplied).

The literal language of § 2517, therefore, states that evidence of communications derived from a wiretap may be introduced in *any* court, even if relating to crimes different from those specified in the order authorizing the original interception, provided that a judicial determination is made that the contents of the intercepted communications *were otherwise lawfully intercepted.* Nothing in the legislative history of that section contradicts its literal language. Senate Report No. 1097, *supra,* p. 2189.

---

7. State v. Siegel, *supra,* 266 Md. at 271, 292 A.2d 86; Senate Report No. 1097, p. 2187.

The final and most persuasive reason for this court's interpretation of Title III is founded upon the language of 18 U.S.C. § 2518(10)(a) which reads as follows:

"(10)(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

"(i) the communication was *unlawfully intercepted*;

"(ii) the order of authorization or approval *under which it was intercepted* is insufficient on its face; or

"(iii) *the interception* was not made in conformity with the order of authorization or approval."

(Emphasis supplied).

"Section 2515 of the Act provides that the contents of any intercepted wire or oral communication, and any derivative evidence may not be used at a criminal trial . . . 'if the disclosure of the information would be in violation of this chapter.'" United States v. Chavez, *supra*, 416 U.S. at 570, 94 S.Ct. at 1855. As is stated in the Senate Report on Title III, § 2518(10)(a) "provides *the remedy* for the right created by section 2515." (Emphasis supplied). Senate Report No. 1097, *supra*, p. 2195.

Where an alleged defect has occurred of non-constitutional magnitude in the procedures followed which resulted in the wiretap evidence sought to be introduced in court, one must look to the statutory scheme of Title III to "determine if Congress has provided that suppression is required for this particular procedural error." United States v. Chavez, *supra*, 416 U.S. at 570, 94 S.Ct. at 1854. ■ Where the alleged defect warranting suppression is of a nonconstitutional type, as is the case here, the al-

leged defect must come within one of the three grounds set forth by Congress as justifying the extraordinary sanction of suppression. United States v. Chavez, *supra*. It is apparent, however, that § 2518(10)(a)(i), (ii), and (iii) each deals either with the authorization of, or the procedures used in, the interception itself and not with the use of the intercepted communications *after* they have been otherwise lawfully intercepted. In short, the language of § 2518(10)(a) demonstrates again that the intent of Congress in Title III was to treat matters relating to disclosure and use of otherwise lawfully intercepted wire or oral communications as different from matters relating to the validity of the interception authorizations and procedures themselves.

■ Further illustrative of Congressional intent is the wording of 18 U.S.C. § 2520 as contrasted with that of § 2518(10)(a)(i), (ii), and (iii). That former section authorizes the recovery of actual and punitive damages, as well as attorney's fees by "[A]ny person whose wire or oral communication is *intercepted, disclosed* or *used* in violation of this chapter . . . ." (Emphasis supplied). Apparently Congress, in dealing with the question of potential suppression of evidence in judicial or quasi-judicial proceedings, was content to limit the remedy of suppression to those situations involving the validity of the interception authorizations and procedures while creating a potential civil remedy which would impose a sanction on those who unlawfully disclosed or used wire or oral communications which were lawfully intercepted. This policy is rational and constitutional and one with which this court cannot interfere. Furthermore, a criminal penalty was created by Congress which imposed a sanction upon those who, in violation of Title III, knowingly *disclosed* or *used* the contents of wire or oral communication which had been intercepted unlawfully, 18 U.S.C. § 2511(1)(c) and (d). Thus, the remedy of suppression was limited by Congress solely to situations

involving *unlawful interception* while extending criminal and civil sanctions against those who *unlawfully disclose or use* the contents of intercepted wire or oral communiations as well as to those who unlawfully intercept said communications.

### III.

The court will now take up the fourth contention of the defendants since the view which the court takes of that contention makes it unnecessary to decide the issue of probable cause raised in defendants' third contention.

Defendants' fourth contention is that the application for the order and the supporting affidavit failed, in violation of 18 U.S.C. § 2518(1)(c), to include:

"*a full and complete statement* as to whether or not other investigative procedures have been tried and failed or *why* they reasonably appear to be unlikely to succeed if tried or to be too dangerous, . . .." (Emphasis supplied).

This failure, they contend, made it impossible for Judge Proctor to determine as required by § 2518(3)(c) that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous, . . .."

Judge Proctor found, in his January 31, 1973 order, that there was probable cause to believe "that no other investigative order would be successful in obtaining sufficient evidence of the violations and conspiracy as aforementioned." Assuming that this statement adequately reflects the judicial finding required by § 2518(3)(c), the question raised by defendants is whether Judge Proctor had sufficient basis for such finding.

In the petition and affidavit for the wiretap authorization, the only statement directly referring to the futility of other methods of investigation is located in ¶ 7 of the State's Attorney's petition, as follows:

"I further believe that . . . all other investigative methods or techniques available have been applied by the members of the Baltimore County Police Department who are conducting this investigation. I further believe that the necessary evidence needed to prove the aforementioned criminal violations can be obtained only by means of interceptions of telephonic communication passing through the telephones located in 1201 64th Street. . . .."

The Government concedes [8] that this statement, standing alone, is not a "full and complete statement" as required by § 2518(1)(c). But the Government then contends that:

"the affidavits of the two . . . officers, submitted with the application and incorporated by reference, supplement the State's Attorney's belief and conclusions, by demonstrating that all reasonable investigative techniques, under the prevailing circumstances, had been tried, but had failed to disclose the identities of the other persons participating with Buddemeyer in the illegal gambling operation." [9]

This argument by the Government must be analyzed in the light of a comprehension of the statements contained in the single affidavit [10] executed by Detectives Bost and Miller of the Baltimore County Police Department which accompanied and formed a part of the application.

The affidavit recites in pertinent part that on December 26, 1972, a reliable confidential informant told Detective Bost that an individual whom he knew, one Harry Buddemeyer, ". . . was involved in a Bookmaking operation with several other persons who [were] unknown to the . . . informant";

---

8. Memorandum Response by Goverment to Motion, p. 16.

9. *Ibid.*

10. Although the Government's memorandum referred to "affidavits" of the two detectives, there was in fact one affidavit signed by both.

that the informant stated that 1201 64th Street, Essex district of Baltimore County, was "a base of operations" for Buddemeyer from which he would call other persons, unknown to the informant, to see if the "operation" was running smoothly and that he would use telephones with Nos. 866–1966 and 866–8491 for that purpose; that the detectives on that day at approximately 12:30 p. m. observed the above property to be the site of a house and that an automobile with Maryland dealer license plate No. D–28915 was parked in the driveway; that later that day they learned from telephone company records that both telephone numbers were "non-published" and that one was listed to Richard Allan Morris of 1201 64th Street and the other was listed to Mrs. John Haynes of the same address; that sporadic surveillance of the property over the next month revealed that Harry Henry Buddemeyer, whose identity was positively established through long-range photography, usually arrived at the property between 8 and 9 a. m. every weekday morning in various automobiles, all of which bore the same dealer license tag, and that he usually left the property at approximately 5:15 p. m. by car and drove to Don's Motors on Eastern Avenue in Essex where he stayed a few minutes before driving to his residence on Liberty Parkway; that the dealer's license plate on the cars operated by Buddemeyer was registered to Hugh T. Little, Inc., t/a Don's Motors; that Buddemeyer and Hugh Thomas Little, whom surveillance demonstrated to be a person present at Don's Motors when Buddemeyer went there upon leaving 1201 64th Street, both had records of arrest on gambling charges and that Buddemeyer had twice been convicted on such charges; that surveillance of the house on 64th Street showed that a young female, believed to be one Linda Louise Stancliffe, a person without a criminal record, regularly arrived at the house at approximately 10:30 a. m. carrying a "National Armstrong Daily News Review (commonly called a scratch sheet)" and left a few minutes later without it being visible; that the female was followed by the detectives on several occasions to a number of shopping centers and that the detectives thought she twice used "counter-surveillance" techniques; that on one occasion a white male, who arrived in a 1971 Oldsmobile with Maryland registration CV1666, went into the 64th Street house for about nine minutes, leaving just before Buddemeyer did at 5:15 p. m.; that on Sunday, January 28, 1973, two checks at 12:15 p. m. and 2:30 p. m. at the 64th Street property revealed no automobile in the driveway, and that the affiants, both detectives experienced in investigations of "illegal telephonic Bookmaking operations," based upon "their knowledge, training and experience in the investigation of illegal Bookmaking Operations . . . ." had ". . . probable cause to believe . . . that Harry Henry Buddemeyer and others unknown . . ." were violating the gambling laws of the State of Maryland.

There is no statement in the affidavit setting out whether any attempt was made to learn the identity of the male in the 1971 Oldsmobile with Maryland registration CV1666 and, if not, why not. Neither is there a statement as to whether any attempt was made by inquiry to the informant or in any other manner, to learn if the persons in whose names the phones were listed were involved in the "operation" or if they even existed, and if no such attempt was made, why no such attempt was made. The affidavit does not disclose whether any effort was made to keep Hugh T. Little or Don's Motors under surveillance to attempt to learn of the identity of his associates other than Buddemeyer. The affidavit does not disclose whether or not any further inquiry was made of the confidential informant after the identities of Little and Linda Stancliffe had been tentatively established to see if he knew them or anything about their activities since the informant's previous statement that he did not know the identity of Buddemeyer's associates does not

necessarily mean that he did not know who Little and Stancliffe were, but only that he did not know of their connection with the "operation." No reason is ascribed as to why the informant or an undercover agent could not attempt to infiltrate the "operation" nor is there any statement as to why a search, pursuant to duly issued warrants, could not be carried out at the 64th Street house, at Don's Motors, and perhaps at the residence of Linda Stancliffe. Furthermore, no statement appears as to whether a pen register [11] device was attached to the telephones at 1201 64th Street, pursuant to a warrant, to determine how many incoming and outgoing calls were made on the telephones at that address and the telephone numbers to which outgoing calls were made, nor is there any statement as to why a pen register device was not used.

While there may have been eminently sound reasons why these investigative techniques were not considered to be likely to succeed, if tried, those reasons were not made known to Judge Proctor in the application, nor was Judge Proctor told in the application that those techniques had been tried but had proved unsuccessful.

A discussion of the requirements of § 2518(1)(c) can best begin by highlighting parts of the philosophy and purpose of the 1968 Act. In the words of Mr. Justice White:

"The Act is not as clear in some respects as it might be, but it is at once apparent that it not only limits the crimes for which intercept authority may be obtained but also imposes important preconditions to obtaining any intercept authority at all. Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear *intent to make doubly sure that the statutory authority be used with restraint* and only where the circumstances warrant the surreptitious interception of wire and oral communications. *These procedures were not to be routinely employed as the initial step in criminal investigation.* Rather, *the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.* §§ 2518(1)(c) and (3)(c). *The Act plainly calls for the prior, informed judgment of enforcement officers desiring court approval for intercept authority, and investigative personnel may not themselves ask a judge for authority* to wiretap or eavesdrop. The mature judgment of a particular responsible Department of Justice official is interposed as a critical precondition to any judicial order.

"The legislative history of the Act supports this view." (Emphasis supplied).

United States v. Giordano, 416 U.S. at 515–516, 94 S.Ct. at 1826–1827.

As the Senate Report states, however, a determination of whether other investigative techniques should be utilized ". . . would involve a consideration of all the facts and circumstances. . . . Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. . . . What the provision envisions is that the showing be tested in a practical and common sense fashion." Senate Report No. 1097, p. 2190.

Judge Tjoflat expressed it succinctly when he said in United States v. Lanza, 356 F.Supp. 27 at 30 (M.D.Fla.1973):

"The purpose of the exhaustion requirement is not to foreclose the use of electronic surveillance until the state has exhausted every possible means of obtaining a viable case against the subjects, but merely to *inform the authorizing magistrate or judge of the nature and progress of the investigation and the difficulties*

---

11. For a description of a pen register, see United States v. Focarile, 340 F.Supp. 1033, 1939–1940 (D.Md.1972).

*inherent in the use of normal techniques."* (Emphasis supplied).

The Fourth Circuit has said that the application must contain *"a complete statement* as to *why* normal investigative procedures are not being used."* (Emphasis supplied). United States v. Bobo, *supra*, 477 F.2d at 981. In that case, there was a detailed statement in the affidavit accompanying the application relating the reasons why, in the experienced judgment of the law enforcement officer involved, normal investigative techniques would not be successful. The statement said in part:

"Through my experience and the experience of other Special Agents who have worked on gambling cases, records that have been seized in gambling raids have generally not been sufficient to establish the interstate elements of federal offenses because such records are difficult to interpret and are sometimes in code. Many times these records are of little or no significance without further knowledge of the gambler's activities and the interstate nature of the gambling operation. The confidential informants referred to in this affidavit refuse to testify against the parties named herein because of fear for their personal safety. Physical surveillances on gambling operations heretofore mentioned have failed to furnish substantial information of a federal gambling violation because there is little or no personal contact between these persons. If surveillance is conducted on a regular basis, it would jeopardize the investigation. Furthermore, the utilization of undercover agents would not likely prove a federal violation due to the small number of people who have access to the overall plan or scheme."

477 F.2d at 983. No comparable statement appears in the affidavit of detectives Bost and Miller.

Similarly, in all but one of the reported federal cases which this court's research has found in which the wiretap procedures utilized have been held to satisfy the provisions of §§ 2518(1)(c) and 2518(3)(c), the opinions of the trial courts make it clear that the applications and accompanying papers in those cases contained stated reasons *why* other investigative techniques would not be likely to succeed if tried or that they had been tried and failed. United States v. Falcone, 364 F.Supp. 877, 888–889 (D.N.J.1973); United States v. Denisio, 360 F.Supp. 715, 718–719 (D. Md.1973); United States v. Askins, 351 F.Supp. 408, 414 (D.Md.1972); United States v. Whitaker, 343 F.Supp. 358, 362–363 (E.D.Pa.1972), rev'd on other grounds, 474 F.2d 1247 (3rd Cir. 1973), cert. den. 412 U.S. 953, 93 S.Ct. 3003, 37 L.Ed.2d 1006 (1973); United States v. Focarile, 340 F.Supp. 1033, 1042–1044 (D.Md.1972); United States v. King, 335 F.Supp. 523, 535 (S.D.Calif.1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973), cert. den. 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 94 (1973); United States v. Leta, 332 F.Supp. 1357, 1362 (M.D.Pa.1971), rev'd on other grounds sub nom. United States v. Ceraso, 467 F.2d 647 (3rd Cir. 1972). In the one case in which it is not clear, it does appear likely that the affidavit accompanying the application did, in fact, recite the reasons why the purposes of the investigation could not have been accomplished by any means other than by use of the wiretap. United States v. Staino, 358 F.Supp. 852, 856–857 (E.D.Pa.1973).

Of course, as in traditional search warrant practice, the validity of the application for the wiretap authorization and for the order of the authorizing judge cannot be established through the exercise of hindsight. The application and the order must be viewed in the light of circumstances as they existed and were known or reasonably anticipated at the time and cannot be "bootstrapped" by what the wiretap later uncovered. Whiteley v. Warden, 401 U.S. 560, 567 n. 11, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); Spinelli v. United States, 393 U.S. 410, 413 n. 3, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 12

L.Ed.2d 723 (1964); United States v. Melvin, 419 F.2d 136, 140 (4th Cir. 1969). The observations of the judges in *Falcone* and *King* that the difficulty of obtaining reliable evidence in the investigation of a large scale conspiracy is self-evident does not apply in the instant case (even assuming that Judge Proctor could take judicial notice of such difficulty) since no "large scale conspiracy" was shown to exist in the affidavit. For all the affidavit shows, the Buddemeyer "Operation" could have been too small for Federal prosecution, 18 U.S.C. § 1955(b)(1)(ii).

 Judge Proctor, furthermore, could not take judicial notice of the difficulty in investigating a gambling or bookmaking operation through normal investigatory techniques. No suggestion has been made by the Government that a wiretap is, in fact, a necessary ingredient of *every* successful investigation of a gambling or bookmaking business. If a wiretap is not necessary for every successful investigation, then there must be some criteria for determining when it is necessary due to the fact that other investigatory techniques will not be likely to work and when it is not necessary due to the fact that other investigatory techniques have worked or appear likely to work. The criteria for that determination would ordinarily initially be based upon some expertise or experience in the investigation of similar crimes providing knowledge of the techniques of investigation available, their success in the past under varying circumstances, the prevailing and common *modus operandi* of persons engaged in criminal activity of the sort being investigated as well as upon an intimate knowledge of the methods and results of investigative techniques which had been employed up to that time in the investigation at hand. It is apparent that this is the reason for the requirement of § 2518(1)(c) of a "full and complete statement." It is equally apparent that the authorizing judge, in the absence of such "full and complete statement," may not supply through judicial notice that

which the application might have, but did not, contain. *See* Alvary v. United States, 302 F.2d 790, 794 (2nd Cir. 1962); United States v. Moia, 251 F.2d 255, 258 (2nd Cir. 1958); McCormick, Law of Evidence, p. 287 et seq.

For the reasons stated, Judge Proctor did not have sufficient information in the application as required by § 2518(1)(c) to allow him to make the informed decision required by § 2518(3)(c). The wiretap was therefore improperly authorized and the communications sought to be suppressed by this motion were "unlawfully intercepted" within the meaning of § 2518(10)(a)(i). The motion to suppress will be granted.