# STATE OF MARYLAND *v.* SIEGEL

[No. 8 (Adv.), September Term, 1972.]

*Decided July 3, 1972.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ., and RALPH W. POWERS, Chief Judge of the Seventh Judicial Circuit, specially assigned.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Edward F. Borgerding, Assistant Attorney General,* on the brief, for appellant.

*H. Thomas Howell,* with whom was *Norman P. Ramsey* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

This case points up the great problems both legal and moral that we must again ponder in the wake of mankind's continuing scientific advancement—an advancement that staggers the imagination with its potential for good but causes us pause for fear that we may create "Frankenstein's" monster [1] and be unable to channel its growth. This is not a new or even unique quandary but one which most recently came into sharp focus with the advent of the atomic age. Nuclear energy offers the promise of relief to a large portion of the earth's population by alleviating such pressing problems as famine and plague but it also portends the very real menace of total destruction because of the weaponry it has produced. The industrialization of most of the world, while offering a life style unparalleled in the history of civilization, has also polluted much of nature's beauty and threatens to contaminate the very air we breathe. This same dichotomy applies to the development of electronic equipment. The benefits accruing to society are innumerable but the possibility of abuse is considerable. The issue now before

---

1. *Frankenstein,* written in 1818 by Mary G. W. Shelley (1797-1851).

this Court concerns electronic surveillance, more especially the wiretap.

On October 26, 1969, the State's Attorney for Baltimore City, Charles E. Moylan, "upon his own authority pursuant to Article 27, Section 125A and Article 35, Section 94, Annotated Code of Maryland, 1957 edition, as amended, and pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 [18 U.S.C. §§ 2510-20]" petitioned the Supreme Bench of Baltimore City to authorize "the use of electronic, mechanical or other devices and equipment to intercept and record telephonic wire communications pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968; Article 27, Section 125A, Annotated Code of Maryland, 1957 edition as amended; Article 35, Sections 92 through 99, Annotated Code of Maryland, 1957 edition as amended; and the Fourth Amendment of the Constitution of the United States." The application alleged that Maurice T. Siegel, appellee, and Robert London were conspiring to violate the lottery laws of this State, Maryland Code (1957, 1971 Repl. Vol.), Art. 27, §§ 38, 356-58, and 360-67. Judge Charles D. Harris issued the requested order permitting the State Police to intercept specified telephone lines from 11:00 a.m. October 6, 1969 to 6:00 p.m. October 10, 1969, so as to gather evidence of the illegal activities. Following expiration of this original authorization, renewal orders were issued by Judge Harris on October 13 and again on November 5, 1969. All told the wires were tapped for a total of twenty-one days intercepting 1448 conversations.[2]

2. "According to the returns made to the court, interception under the order of 6 October began at 3:15 P.M. that day and continued uninterruptedly until 5:55 P.M. October 10th on all four of the telephone lines designated, resulting in the interception of 491 communications.

Under the order of 13 October interception commenced at 11:50 P.M. on that day and continued uninterruptedly until 7:04 P.M. October 20th on three of the lines, resulting in the interception of 544 communications.

Under the order of 5 November interception commenced on two of the lines at 10:15 A.M. on that day and continued uninterruptedly until 5:40 P.M. on November 12th, resulting in the interception of 413 communications." *State v. Siegel*, 13 Md. App. 444, 465, 285 A. 2d 671 (1971).

On the basis of this electronically acquired evidence, an indictment was returned on November 14, 1969, jointly charging Siegel, a member of the bar, and London with conspiracy to violate the lottery laws of the State.[3] The appellee filed a motion to suppress all the intercepted conversations and on November 30, 1970 Judge Harris (the initial issuing authority) so ordered. He based his decision on Siegel's claim, "That the indictment is founded upon the contents of telephonic and oral communications unlawfully intercepted by the State . . . in violation of the Defendant's rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States, and of the Maryland Declaration of Rights, and of Title III of the Omnibus Crime Control and Safe Streets Act of 1968." From that ruling the State unsuccessfully appealed to the Court of Special Appeals. (*State v. Siegel*, 13 Md. App. 444, 285 A. 2d 671 (1971).) We granted certiorari.

Several issues are presented for our consideration but under our view of the case we need only discuss the following two:

(i) Are the provisions of the Omnibus Crime Control and Safe Streets Act constitutional and properly implemented in Maryland by the provisions of Code (1957, 1965 Repl. Vol.), Art. 35, §§ 92-99, and Code (1971 Repl. Vol.), Art. 27, §§ 125A-D?

(ii) Were the wiretap orders of Judge Harris void for failure to comply with the provisions of Title III?

## CONSTITUTIONALITY

To begin with it is necessary for us to determine whether Title III is in violation of the Fourth Amend-

---

3. The State proceeded against London separately after Siegel suffered successive heart attacks. Judge Harold Grady, in the Criminal Court of Baltimore, granted London's motion to suppress all the intercepted communications and no appeal was taken from that order. On August 17, 1970 the State entered a nolle prosequi as to that defendant. By court order the tapes of the various conversations were eventually delivered to London's attorney to be kept intact and under seal.

ment of the Constitution of the United States.[4] Siegel contends that the Omnibus Crime Bill is facially unconstitutional because it fails "to prescribe adequate standards as to the duration, particularity, and judicial supervision of court-ordered wiretapping." In responding to this claim we must first observe that any statute which trespasses upon "The right of the people to be secure in their persons, houses, papers, and effects . . ." must be viewed with a jaundiced eye. The right to privacy is not only a keystone to our legal philosophy but also one of the most cherished ideals of our form of democracy. It is a concept which should foster security in the minds of our citizenry and not foster anxiety that they will be subjected to excessive governmental intrusion.[5] Under the Constitution there is no place in this country for an unfettered police force such as terrorized Germany and Italy during the 1930's and 1940's and which runs rampant today in many other parts of the world. It would be intolerable for the spectre of recrimination to silence the dialogue and dissent which is so necessary to the lifeblood of our society. In these scientifically sophisticated times the distinct possibility of "Big Brotherism" [6] is apparent. We live in a world which has the capability not only to monitor our conversations, to "bug" our houses, but soon probably to delve into our innermost thoughts. To allow any of these things to occur without

---

4. Appellee is only testing here the constitutionality of Title III under the Fourth Amendment.

5. Mr. Justice Stewart, speaking for the Supreme Court of the United States in *Katz v. United States*, 389 U. S. 347, 350-51, 19 L.Ed.2d 576, 88 S. Ct. 507 (1967), stated:

> "[The Fourth] Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all. Other provisions of the Constitution protect personal privacy from other forms of governmental invasion. But the protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States."

6. The term originates from the book *1984*, written in 1948 by George Orwell (1903-1950).

the strictest of controls would utterly destroy the basis of this nation's existence.

We recognize of course that the Fourth Amendment itself restricts the rights of which it speaks. Its guarantees are broad but not boundless. *United States v. U. S. Dist. Ct. E. D. Mich.,* 407 U. S. 297, 314, 32 L.Ed.2d 752, 92 S. Ct. 2125 (1972). In entirety it provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Supreme Court of the United States, *Warden, Maryland Penitentiary v. Hayden,* 387 U. S. 294, 18 L.Ed.2d 782, 87 S. Ct. 1642 (1967), recently discussed the historical background of the Fourth Amendment. There, Mr. Justice Brennan stated for the Court:

> "We have examined on many occasions the history and purposes of the Amendment. It was a reaction to the evils of the use of the general warrant in England and the writs of assistance in the Colonies, and was intended to protect against invasions of 'the sanctity of a man's home and the privacies of life,' from searches under indiscriminate, general authority. Protection of these interests was assured by prohibiting all 'unreasonable' searches and seizures, and by requiring the use of warrants, which particularly describe 'the place to be searched, and the persons or things to be seized,' thereby interposing 'a magistrate between the citizen and the police,' . . ." *Id.* at 301 (citations omitted).

The question now before us is whether the federal statute was drawn in conformity with these requirements.

The long and undistinguished history of eavesdropping can undoubtedly be traced to man's earliest beginnings and at common law the practice was condemned as a

nuisance. 4 *Blackstone's Commentaries,* 1570, Ch. 13 (Lewis ed. 1897). Originally, the act was accomplished by someone listening "under walls or windows or the eaves of a house, to harken after discourse, and thereupon to frame slanderous and mischievous tales . . . ." *Blackstone, supra.* However, this crude methodology quickly became outmoded. On May 24, 1844, Samuel F. B. Morse telegraphed the rather prophetic message, "What hath God wrought", and from then on every advancement noted in telecommunications has been received by a like response in the ability to surreptitiously intercept. To combat this threat the first statute prohibiting wiretapping was passed as early as 1862 and since that time such laws have proliferated.[7] The Supreme Court heard its initial wiretap case in 1928, *Olmstead v. United States,* 277 U. S. 438, 72 L. Ed. 944, 48 S. Ct. 564 (1928). There, Mr. Chief Justice Taft, for the Court, said:

> "The language of the [Fourth] Amendment can not be extended and expanded to include telephone wires reaching to the whole world from the defendant's house or office. The intervening wires are not part of his house or office, any more than are the highways along which they are stretched.
>
> This court, in *Carroll v. United States,* 267 U. S. 132, 149 . . . declared:
>
>> 'The 4th Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted and in a manner which will conserve public interests as well as the interests and rights of individual citizens.'
>> * * *
>
> We think, therefore, that the wire tapping

---

7. California passed the original law and by 1895 Illinois followed suit. Maryland enacted its first wiretapping statute in 1956. For a background discussion of this State's wiretap legislation see *Manger v. State,* 214 Md. 71, 133 A. 2d 78 (1957).

here disclosed did not amount to a search or seizure within the meaning of the 4th Amendment." *Id.* at 465-66.

Subsequent to *Olmstead,* there were several other decisions involving wiretaps and "bugging" in which the Supreme Court adhered to its "no trespass" doctrine. *Goldman v. United States,* 316 U. S. 129, 86 L. Ed. 1322, 62 S. Ct. 993 (1942) ; *On Lee v. United States,* 343 U. S. 747, 96 L. Ed. 1270, 72 S. Ct. 967 (1952). The earliest indication of change was in *Silverman v. United States,* 365 U. S. 505, 5 L.Ed.2d 734, 81 S. Ct. 679 (1961), where the Court held that "bugging" which involved a trespass, even though technical, violated the Fourth Amendment. However, the radical departure waited until 1967 for *Katz v. United States,* 389 U. S. 347, 19 L.Ed.2d 576, 88 S. Ct. 507. There, Mr. Justice Stewart stated for the majority: "We conclude that the underpinnings of *Olmstead* and *Goldman* have been so eroded by our subsequent decisions that the 'trespass' doctrine there enunciated can no longer be regarded as controlling." *Id.* at 353. In that opinion the Court also said:

"Indeed, we have expressly held that the Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording of oral statements, overheard without any 'technical trespass under . . . local property law.' *Silverman v. United States,* 365 U. S. 505, 511, 5 L.Ed.2d 734, 739, 81 S. Ct. 679, 97 A.L.R.2d 1277. Once this much is acknowledged, and once it is recognized that the *Fourth Amendment protects people—and not simply 'areas'—*against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure." *Id.* at 353 (emphasis added).

*Katz* is but one of a trilogy of eavesdropping cases

the Supreme Court decided during 1966 and 1967 which we must now consider in determining the constitutionality of Title III. The other two are *Osborn v. United States,* 385 U. S. 323, 17 L.Ed.2d 394, 87 S. Ct. 429 (1966) and *Berger v. New York,* 388 U. S. 41, 18 L.Ed.2d 1040, 87 S. Ct. 1873 (1967). Congress, in passing the Omnibus Crime Bill, unquestionably intended it as the offspring of this troika and they were faced with no small task. As Mr. Justice Clark observed for the Court in *Berger:*

> "It is said that neither a warrant nor a statute authorizing eavesdropping can be drawn so as to meet the Fourth Amendment's requirements. If that be true then the 'fruits' of eavesdropping devices are barred under the Amendment. On the other hand this Court has in the past, under specific conditions and circumstances, sustained the use of eavesdropping devices." *Id.* at 63.

We now address ourselves to whether Congress was successful in its battle. The constitutionality of Title III has not yet been adjudicated by the Supreme Court, although a number of lower federal courts have decided the issue.[8] But it is quite clear that wiretapping is permissible

8. These cases have held the statute constitutional: *United States v. Cox,* 462 F. 2d 1293 (8th Cir. 1972); *United States v. Cox,* 449 F. 2d 679 (10th Cir. 1971), *cert. denied,* 406 U. S. 934 (1972); *United States v. Focarile,* 340 F. Supp. 1033 (D. Md. 1972); *United States v. LaGorga,* 336 F. Supp. 190 (W. D. Pa. 1971); *United States v. King,* 335 F. Supp. 523 (S. D. Cal. 1971); *United States v. Lawson,* 334 F. Supp. 612 (E. D. Pa. 1971); *United States v. Becker,* 334 F. Supp. 546 (S. D. N. Y. 1971); *United States v. Perillo,* 333 F. Supp. 914 (D. Del. 1971); *United States v. Leta,* 332 F. Supp. 1357 (M. D. Pa. 1971); *United States v. Scott,* 331 F. Supp. 233 (D. D. C. 1971); *United States v. Cantor,* 328 F. Supp. 561 (E. D. Pa. 1971); *United States v. Sklaroff,* 323 F. Supp. 296 (S. D. Fla. 1971); *United States v. Escandar,* 319 F. Supp. 295 (S. D. Fla. 1970), reversed on other grounds *sub nom United States v. Robinson,* (5th Cir. Jan. 12, 1972).

Recently, in *United States v. Whitaker,* 343 F. Supp. 358 (E. D. Pa. 1972) the statute was held unconstitutional. Many commentators have also raised serious questions about the constitutionality of the act. Schwartz, *The Legitimation of Elec-*

under appropriate circumstances. *Katz, supra; Berger, supra.*

In *Berger v. New York,* 388 U. S. 41, the Court held a state law unconstitutional because that "statute's blanket grant of permission to eavesdrop is without adequate judicial supervision or protective procedures." *Id.* at 60. The Supreme Court found four basic faults with the New York act. First, "eavesdropping is authorized without requiring belief that any particular offense has been or is being committed; nor that the 'property' sought, the conversations, be particularly described." *Id.* at 58-59. Secondly,

> "authorization of eavesdropping for a two-month period is equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause. . . . Moreover, the statute permits, and there were authorized here, extensions of the original two-month period—presumably for two months each—on a mere showing that such extension is 'in the public interest.' Apparently the original grounds on which the eavesdrop order was initially issued also form the basis of the renewal. This we believe insufficient without a showing of present probable cause for the continuance of the eavesdrop." *Id.* at 59.

Thirdly, "the statute places no termination date on the eavesdrop once the conversation sought is seized. This is

tronic *Eavesdropping: The Politics of "Law and Order,"* 67 Mich. L. Rev. 455 (1969); Criminal Law Education and Research Center, *Wiretapping and Electronic Eavesdropping: The Law and Its Implications* (1969). Also, Mr. Justice Douglas has indicated his belief that Title III is violative of the Fourth Amendment in his dissenting opinion to denial of a writ of certiorari in *United States v. Cox,* 406 U. S. 934, 32 L.Ed.2d 136, 92 S. Ct. 1783 (1972).

Last month, the Supreme Court, in *United States v. U. S. Dist. Ct. E. D. Mich.,* 407 U. S. 297, 32 L.Ed.2d 752, 92 S. Ct. 2125 (1972), discussed certain provisions of Title III. However, the Court specifically did not consider the constitutionality of that federal act.

left entirely in the discretion of the officer." *Id.* at 59-60. Finally,

> "the statute's procedure, necessarily because its success depends on secrecy, has no requirement for notice as do conventional warrants, nor does it overcome this defect by requiring some showing of special facts. On the contrary, it permits unconsented entry without any showing of exigent circumstances. Such a showing of exigency, in order to avoid notice, would appear more important in eavesdropping, with its inherent dangers, than that required when conventional procedures of search and seizure are utilized. Nor does the statute provide for a return on the warrant thereby leaving full discretion in the officer as to the use of seized conversations of innocent as well as guilty parties." *Id.* at 60.

While *Berger* dealt with an overbroad statute, *Katz v. United States,* 389 U. S. 347, involved a wiretap that was invoked without judicial authorization. There, the Court stated: "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351 (citations omitted). The Court further said that the absence of physical penetration no longer "forecloses Fourth Amendment injury." And it discredited the premise that property interests are controlling as to whether the government has the right to search and seize. *Id.* at 353. The majority concluded that the wiretap was impermissible because it did not have judicial sanction. Even though the federal agents used restraint,

> "the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. They were not required, before com-

mencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized. In the absence of such safeguards, this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end." *Id.* at 356-57.

*Osborn v. United States,* 385 U. S. 323, was decided prior to either *Berger* or *Katz,* and was relied upon by each in significant measure. It was not a wiretap case but rather involved the tape recording of a conversation by one of its two participants. In permitting the evidence thus obtained, Mr. Justice Stewart, speaking for the majority, based the decision squarely on *Lopez v. United States,* 373 U. S. 427, 10 L.Ed.2d 462, 83 S. Ct. 1381 (1963).[9] He said:

"[I]n response to a detailed factual affidavit alleging the commission of a specific criminal offense directly and immediately affecting the administration of justice in the federal court, the judges of that court jointly authorized the use of a recording device for the narrow and particularized purpose of ascertaining the truth of the affidavit's allegations. As the district judges recognized, it was imperative to determine whether the integrity of their court was being undermined, and highly undesirable that

---

9. In *Lopez,* the Supreme Court allowed into evidence the tape recorded conversations of an attempt to bribe a government agent.

> this determination should hinge on the inconclusive outcome of a testimonial contest between the only two people in the world who knew the truth—one an informer, the other a lawyer of previous good repute. There could hardly be a clearer example of ' "the procedure of antecedent justification before a magistrate that is central to the Fourth Amendment" ' as 'a precondition of lawful electronic surveillance.' "
> *Id.* at 330.

Both *Katz* and *Berger* interpreted this language to hold that " 'the order authorizing the use of the electronic device' in *Osborn* 'afforded similar protections to those . . . of conventional warrants authorizing the seizure of tangible evidence.' Through those protections, 'no greater invasion of privacy was permitted than was necessary under the circumstances.' " *Katz, supra* at 355, quoting from *Berger, supra* at 57.

To be constitutional, it is clear that Title III must comply with the requirements set out by *Katz, Osborn,* and especially *Berger;* we conclude it does. Initially, the federal act corrects the chief failing in *Katz*—lack of judicial intervention. In that case, governmental surveillance was instituted without the necessity for a neutral magistrate to review an application and determine that there was probable cause warranting a wiretap. Section 2518 (1) (b) of the act, in apparent recognition of this omission, makes it necessary that the petition contain a full and complete set of the circumstances which justify the applicant's belief that the order should be issued. Similarly, in *Katz,* because there was no judicial supervision, the federal agents were not specifically limited in the extent of their search and were not compelled to notify a judicial authority in detail concerning the evidence seized. Title III definitely corrects this fault. By § 2518 (4), each order permitting surveillance must specify: the identity of the person, if known, whose conversations are to be intercepted; "the nature and lo-

cation of the communications facilities as to which, or the place where, authority to intercept is granted"; a particular description of the communication sought and the offense to which it relates; the identity of the agency authorized to intercept; and "the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained." Additionally, under § 2518 (8) (a) the issuing judge has the authority to control the disposition of the evidence after its acquisition.

The four basic problem areas which the Supreme Court enumerated in *Berger* have also, in varying degrees, been corrected by the federal act. The initial difficulty with the New York statute was that it permitted surveillance without a showing of whether any particular offense had been or was being committed and it was not essential to specifically describe the conversations being sought. Title III overcomes this rather obvious defect by requiring in § 2518 (1) (b)

> "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted . . . ."

Section 2518 (3) (a) and (b) makes it necessary for the judge prior to authorizing the interception, to determine probable cause exists that the individual "is committing, has committed, or is about to commit a particular offense", and "particular communications con-

cerning [the] offense will be obtained through [the] interception."

The next pitfalls of *Berger* were the duration of the surveillance, the failure to prescribe a termination date on the eavesdrop once the conversation was intercepted, and the ease of extension. Again, the Omnibus Crime Bill made strides to rectify these deficiencies. By § 2518 (5), "No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." It is argued, by appellee as well as some legal authors,[10] that this thirty day provision is the weak link in Title III. However, even assuming that such is the case, the federal statute has a saving clause. The issuing judge may require under the provisions of § 2518 (6) information about "what progress has been made toward achievement of the authorized objective and the need for continued interception." As to the procedure for extending the original intercept order, by § 2518 (5) it is only permitted upon an application made in accordance with the requirements necessary for the original petition and there must be "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." Section 2518 (1) (f). Probable cause must also be reestablished and the extension periods under § 2518 (5) "must terminate upon attainment of the authorized objective, or in any event in thirty days." In addition, every order and extension, by virtue of § 2518 (5),

> "shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ."

---

10. Schwartz, *The Legitimation of Electronic Eavesdropping: The Politics of "Law and Order,"* 67 Mich. L. Rev. 455 (1969); Spritzer, *Electronic Surveillance by Leave of the Magistrate: The Case in Opposition,* 118 U. Pa. L. Rev. 169 (1969).

The final shortcoming in *Berger* concerned the notice requirement. There, while the need to maintain secrecy was recognized, the Supreme Court complained that no showing of exigent circumstances was made which could justify suspending the necessity of notice. The federal act also obviated this deficiency. Section 2518 (1) (c) stipulates that each application must include: "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . ." In *Berger,* the New York act made no provisions for a return on the warrant, "thereby leaving full discretion in the officer as to the use of seized conversations of innocent as well as guilty parties." 388 U. S. 41 at 60. However, under § 2518 (8) (a) of the federal law, the recordings must be made available to the issuing judge to be "sealed under his directions." It seems quite apparent that the Crime Bill has not only answered the needs of *Katz* and *Berger* but has also extended beyond the scope of these cases. We have no difficulty in concluding the federal act is constitutional.

Having determined that Title III is not violative of the Fourth Amendment, it is now necessary to evaluate whether it can be implemented in Maryland. It is abundantly clear that the federal act is not self-executing as applied to the states. Under § 2516 (2), the principal prosecuting attorney of any state or political subdivision, if *"authorized by a statute of that State"*, may apply "to a State court judge of competent jurisdiction for an order authorizing" the interception of wire or oral communications. (Emphasis added.) That section also states that the issuing judge may grant the order "in conformity with section 2518 of this chapter and with the *applicable State statute* . . . ." (Emphasis added.) However, while Title III requires an appropriate state act before it can be effectuated, under no circumstances is that law enforceable if it is less restrictive than the federal statute so that it grants the governing power more rights at the expense of its citizens. In this vein, § 2515

mandates that evidence obtained by the interception of wire or oral communications, in violation of the Crime Bill, cannot be received in evidence in any court, federal or state. Of course, a state act which is more closely circumscribed than the federal law in granting eavesdrop authority is certainly permissible. *Robert v. State*, 220 Md. 159, 168-69, 151 A. 2d 737 (1959).

The Maryland statutes concerned with the interception of wire or oral communications are Code (1957, 1971 Repl. Vol.), Art. 27, §§ 125A-D, and Code (1957, 1965 Repl. Vol.), Art. 35, §§ 92-99. They provide that upon application from the proper state official, a judge of the circuit court of any county or of the Supreme Bench of Baltimore City may issue an order allowing the interception. (In both articles the State's Attorney is competent to apply but while Art. 35, § 94 (a) permits such a petition from the Attorney General, a similar stipulation is not included in Art. 27, § 125A (b)). These provisions are "applicable State statute[s]" as envisioned under § 2516 (2) and whether each of their terms relating to the application or grant of an order is constitutional *vel non* is of no consequence. Once the hurdle of finding an applicable Maryland law authorizing interception is overcome, compliance must be had with whichever law is more constricting, be it federal or state.

We find that not only is Title III constitutional, but it may be properly implemented in this State.

## APPLICATION

The next and last issue we consider is whether the wiretap orders of Judge Harris are void for failure to comply with the provisions of Title III. As already noted the federal statute specifies that authorization to intercept shall remain in effect only so long as is necessary to achieve the objective, but in no event longer than thirty days. § 2518 (5). To help insure that this stipulation is adhered to, § 2518 (4) (e) requires that *each order* specify: "the period of time during which such in-

terception is authorized, including *a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.*" (Emphasis added.) Similarly, under § 2518 (5), *every order shall* contain a provision that: the interception will commence "as soon as practicable"; and "*shall be conducted in such a way as to minimize the interception of communications* not otherwise subject to interception under this chapter, and *must terminate upon attainment of the authorized objective,* or in any event in thirty days." (Emphasis added.)

The order which Judge Harris issued on October 6, 1969, authorizing the interception and recording of certain designated telephone lines did not contain any of these necessary statements which the act clearly directs. While the duration of the first order was only five days, well within the thirty day provision of Title III, the failure to specify that termination would occur "upon attainment of the authorized objective," left too much discretion in the hands of the state police. The two renewal orders did not correct any of these failings even though the court said in both of them it was "satisfied that the provisions of this Order herein set forth provide that the authorization to intercept . . . will be conducted as soon as practicable and in such a way as to minimize the interception of communications not otherwise subject to interception . . . ." At best this simply entreats the police to not abuse its discretion, at worst it is a mere gratuity having no real force; in either event it is not the mandate required by the act. However, even assuming that this language was a proper directive which complied with the Omnibus Crime Bill, all the orders are still void because the earliest authorization, which the subsequent renewals nursed upon, lacked such a statement. In effect the poisonous taint from the October 6 order pervaded all its successors.

The State urges that no more than substantial compliance with the federal act is essential. In its brief it takes the rather cavalier attitude that: "The rote recita-

tion that the interception shall be executed as soon as practicable and in such a way as to minimize the interception of communications not otherwise subjected to interception has no real meaning so long as the authorizing court" scrutinizes the manner in which the surveillance was actually conducted. We cannot accept this rationalization. The statute sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path. This is in accord with two recent decisions of the Supreme Court of Georgia, *Johnson v. State*, 177 S.E.2d 699, 701, 226 Ga. 805 (1970), and *Cross v. State*, 171 S.E.2d 507, 511-12, 225 Ga. 760 (1969). In both of these cases the orders authorizing electronic surveillance omitted the exact stipulations of Title III that we have just discussed. In each situation the Georgia court said that inclusion of the statements was mandatory. *See also Ansley v. State*, 185 S.E.2d 562, 565, 124 Ga. App. 670 (1971), *cert. denied*, 1971. Since the surveillance here failed to meet certain preconditions designed to protect appellee's constitutional rights, the evidence that arose from it must be suppressed and therefore the order dismissing the indictment will have to be affirmed.

Appellee raises several other arguments in an effort to suppress the intercepted evidence but in light of the views we have just expressed, those contentions do not merit a discussion.

> *Order dismissing indictment affirmed.*
>
> *Costs to be paid by Mayor and City Council of Baltimore City.*