## MARK STEWART HOWARD v. STATE OF MARYLAND

[No. 697, September Term, 1981.]

\* \* \*

## GERALD MATTHEW LECOMPTE v. STATE OF MARYLAND

[No. 747, September Term, 1981.]

*Decided March 2, 1982.*

48

The cause was argued before MOYLAN and LOWE, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals (retired), specially assigned.

*Alan J. Goldstein,* with whom were *Horowitz, Oneglia, Goldstein, Foran & Parker, P.A.* on the brief, for appellants.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Robert C. Bonsib, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

I.

Under the adversary system enjoyed in the administration of justice in this State, it is imperative that a nice balance be struck between responsibility for criminal conduct and the protection of Constitutional rights guaranteed to all persons. If the scale is weighed too heavily on either side, due process is eroded. The attainment of this delicate balance is especially appropriate with respect to searches and seizures. And, in light of the ever increasing variety and sophistication of devices enabling the clandestine interception of wire and oral communications and the efficacy of that tool in the everlasting fight against crime, it is particularly apropos when such a communication is sought to be seized. Recognizing this, the Congress of the United States adopted a comprehensive scheme governing in minute detail "wire interception and interception of oral communications." 18 U.S.C.A. §§ 2510-2520. The General Assembly of Maryland, to implement the federal statute

where called for, and to impose even stricter conditions in certain respects, also enacted legislation on the subject, in major part tracking the federal statute. Maryland Code (1974, 1980 Repl. Vol. § 10-401 through § 10-412, subtitle "Wiretapping and Electronic Surveillance," of the Courts and Judicial Proceedings Article (hereinafter Courts Art.).[1] Complying with the divers conditions prescribed by the statutes places a very real, albeit necessary, burden on the enforcement authorities applying for and carrying out an interception order and on the judge issuing it. Sanction for non-compliance is harsh. Both the federal statute, § 2515, and the State statute, § 10-405, in broad terms, prohibit the receiving in evidence at practically all proceedings any part of the contents of a communication, or any evidence derived therefrom if the disclosure of that information would be in violation of the statutes.

The burden of compliance is aggravated in Maryland due to the unusual stand taken in testing conformance with the conditions. Almost universally other jurisdictions are satisfied if there be substantial compliance with no prejudice shown.[2] Maryland, however, distinguishes between the statutory conditions which apply before or during the interception (preconditions) and those which apply after the termination of the interception (post conditions). With respect to preconditions, Maryland demands strict compliance; substantial compliance is sufficient only in regard to post conditions. This came about by judicial fiat upon construction of the statutes by the Court of Appeals. In *State v. Siegel,* 266 Md. 256, 273-274, 292 A.2d 86 (1972), the Court, examining the validity of interception orders, explicitly

---

1. Although the Congress of the United States has preempted the field by the federal statute, the preemption does not extend to State statutory provisions which are more stringent than the federal law. "[U]nder no circumstances is [the State] law enforceable if it is less restrictive than the federal statute so that it grants the governing power more rights at the expense of its citizens. ... Of course, a state act which is more closely circumscribed than the federal law in granting eavesdrop authority is certainly permissible." State v. Siegel, 266 Md. 256, 271-272, 292 A.2d 86 (1972).

2. *See* article by Richard P. Gilbert, Chief Judge of this Court, *A Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law,* 8 U. Balt. L. Rev. 183, 205-207 (1979).

rejected the substantial compliance standard and unequivocally declared:

> "The statute sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path." (emphasis in original).

In *Spease and Ross v. State,* 275 Md. 88, 338 A.2d 284 (1975), the Court, in determining that the provisions of a wiretap order and the federal law's requirements as to the minimization of interceptions had been satisfied, clearly applied the substantial compliance standard. But it expressly affirmed *Siegel:* "Nothing in our opinion in this case is intended to depart in any way from our holding in *Siegel." Id.* at 108, n. 3.

In *Poore v. State,* 39 Md. App. 44, 384 A.2d 103 (1978), this Court was obliged to construe *Siegel* and *Spease* upon claims that the decisions were in conflict. We found that the teachings of *Siegel* and *Spease* made it "obvious that there is a distinction between *pre-order* and *post-order* compliance. In the former, a defect will void the order and cause suppression of the evidence, but in the latter, a defect will not vitiate the order if there has been substantial compliance and no prejudice to the defendant is shown." 39 Md. App. at 53-54 (emphasis in original). The Court of Appeals denied certiorari. 282 Md. 737 (1978). We explicated this view in *Baldwin v. State,* 45 Md. App. 378, 413 A.2d 246 (1980); *aff'd, State v. Baldwin,* 289 Md. 635, 426 A.2d 916 (1981). In *State v. Mayes,* 284 Md. 625, 399 A.2d 597 (1979), the Court of Appeals iterated the dictate of *Siegel.* Observing that "the directive contained in this language has not been eroded by any decision of this Court over the intervening seven years," it reaffirmed the propriety of the dismissal of the indictment in that case. 284 Md. at 640. But in *State v. Bailey,* 289 Md. 143, 422 A.2d 1021 (1980), the Court admonished that only upon "a superficial reading" of *Siegel* and *Spease* would there appear to be a conflict in the two cases "for no such conflict exists." It pronounced that

"[t]he cases are consistent and compatible with each other." *Id.* at 153. The Court, quoting *Siegel* at 274, pointed out that *Siegel* concerned " 'preconditions designed to protect appellee's constitutional rights. . . . ' " *Id.* In *Spease,* on the other hand, the order was valid on its face and all the statutory requirements were fulfilled. *Id.* The Court explained:

> "The difference between the two cases is clear. The statutory provisions which require the wiretap order to conform to specific minimum guidelines are those which the legislature perceives to contain minimum safeguards to constitutional rights. Once the directives of the statute have been met and a valid order has been issued, compliance, at least in the area of minimization of unauthorized communications and service of inventory, can be judged by a more lenient substantial compliance standard." *Id.* at 153-154.

To like effect is *State v. Baldwin,* 289 Md. 635, 642-643, 426 A.2d 916 (1981), in which the Court speaks of "the substantial compliance test of *Spease.*" Thus, it is readily apparent that the Court of Appeals, although making no reference to the *Poore* and *Baldwin* decisions of this Court, was in accord with the view we had expressed in those cases, namely, that strict compliance was required as to preconditions while substantial compliance sufficed for post conditions.[3] We understand this to be the present status of the law and shall apply it in deciding the instant cases.

---

**3.** We have, of course, as is our duty, unwaveringly honored the *Siegel* directive. "We have not deviated in the slightest from *Siegel's* prescribed path." Baldwin v. State, 45 Md. App. at 379. *See* for example, Nye v. State, 49 Md. App. 111, 430 A.2d 867 (1981); Baldwin v. State, *supra;* Ward v. State, 40 Md. App. 410, 392 A.2d 559 (1978); Shingleton v. State, 39 Md. App. 527, 387 A.2d 1134, *cert. denied,* 283 Md. 738 (1978); Poore v. State, *supra;* Calhoun v. State, 34 Md. App. 365, 367 A.2d 40 (1977).

Early on, with regard to a wiretap order, we observed that "the provisions of the [federal] act, both standing alone and when considered in the light of its legislative history . . . concede no exceptions." State v. Siegel, 13 Md. App. 444, 465, 285 A.2d 671, *aff'd,* 266 Md. 256, 292 A.2d 86 (1972).

## II.

Mark Stewart Howard and Gerald Matthew Lecompte seek to set aside the judgments entered against them at separate trials in the Circuit Court for Prince George's County upon their convictions of violations of the Controlled Dangerous Substances Law.[4] They join in this appeal and jointly urge that the trial court erred in denying their motions to suppress evidence derived from wire interceptions. They claim that receipt of the challenged evidence in their respective trials violated the federal and State statutes and point to a gaggle of preconditions relating to the interceptions, alleging that there was not strict compliance as to them. Their contentions go to the applications for the interception orders, to the affidavits supporting the applications, to the orders issued and to the reports submitted on the progress of the interception. We agree that the conditions on which they rely apply before or during the conduct of the interception and, therefore, as preconditions, must be followed without the slightest deviation from their prescribed paths. We do not agree, however, that there was not strict compliance in regard to them. We believe that the enforcement and judicial authorities here involved carried out the dictates of the interception statutes to the letter as *Siegel* requires. We have carefully considered the contentions of appellants, as best we are able to sort them out and understand them as presented, and are not persuaded to the contrary. We affirm and give our reasons.

---

4. Howard was convicted at a court trial upon stipulation of facts of possession of cocaine with intent to distribute (1st count) and possession of cocaine (2d count). The court merged the conviction under the second count into the conviction under the first count and imposed a sentence of 4 years and a fine of $5,000 and costs.

Lecompte was convicted upon trial by jury of conspiracy to distribute cocaine (2d count), conspiracy to possess cocaine with the intent to distribute (3d count) and conspiracy to possess cocaine (4th count). The court merged the conviction under the third count into the conviction under the second count and the conviction under the fourth count into the convictions under the second and third counts. It imposed a sentence of 10 years and a fine of $25,000 and costs.

## III.

We are concerned with three orders which authorized wire interceptions. The first was issued on 1 February 1980 by a judge of the Circuit Court for Howard County (Order No. 1). The second was issued on 10 March 1980 by a judge of the Circuit Court for Anne Arundel County (Order No. 2). The third was issued on 10 April 1980 by the judge who issued Order No. 2, and extended that Order (Order No. 3).

Section 2518 (3) of the federal law, and § 10-408 (c) of the State law, in essentially the same language, permit a judge upon request to enter an *ex parte* order authorizing interception of wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting. Whether to enter an order for which application has been made is in the discretion of the judge. But, if he decides to enter it, he can validly do so only upon certain determinations. The state statute, tracking the federal law, provides that the order may be entered:

> "if the judge determines on the basis of the facts submitted by the applicant that:
>
> (1) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in § 10-406 of this subtitle;
>
> (2) There is probable cause for belief that particular communications concerning that offense will be obtained through the interception;
>
> (3) Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
>
> (4) There is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of the offense, or are leased to, listed in the name of, or commonly used by this person."
> Courts Art. § 10-408 (c).

54

Each of the orders entered here contains certain conclusions reached by the issuing judge. The first four conclusions, expressed in identical language in each order, are:

"(1) There is probable cause to believe that the below described individuals have committed, are currently committing, and are about to commit violations of the Controlled Dangerous Substances Laws of the State of Maryland, including the unlawful manufacturing, possession, distribution and conspiracy of Controlled Dangerous Substances violations of Article 27, Sections 276-302, of the Annotated Code of Maryland;

(2) There is probable cause to believe that the below described facilities have been, are being, and will continue to be used by the suspects for said crimes; and the use of the hereinbefore described electronic listening and recording devices, in order to intercept and record the hereinbelow specified communications, is necessary and essential in order to gain evidence leading to the solution of these crimes, to the identity of other persons with whom the described persons are working; and in order to prevent the continuation of said crimes; and

(3) That normal investigative procedures have been tried and failed, or reasonably appear unlikely to succeed if tried or to be too dangerous. Such evidence, in item #2, cannot otherwise be obtained and such prevention measures cannot be exercised by alternative means than by interception as requested; and

(4) There is probable cause to believe that the facilities from which the hereinbelow described communications are to be electronically intercepted and recorded are being used and are about to be used in connection with, and in furtherance of the commission of the aforesaid crimes by the below described individuals. . . ."

The seventh and last conclusion in each order reads in essence:

"(7) The facts and circumstances recited in the Application and in the Affidavit in support thereof and incorporated by reference therein do satisfy me that there is probable cause and furnish a proper legal basis for the issuance of this Ex Parte Order and justify the degree of intrusion sought."

Appellants, below and on appeal, allege that the orders are defective because they do not reflect the determination required by § 10-408 (c) paragraph (2) of the State law (§ 2518 (3) paragraph (b) of the federal law). They concede that the orders "contain every required finding as specified in [18 U.S.C.A.,] Section 2518 (3) and [Courts Art.,] Section 10-408 (c) except for this finding." Below, they also expressly conceded that the respective affidavits showed sufficient probable cause for the judge to reach the conclusion called for by paragraph (2).

The trial court believed that the general, catch-all finding of probable cause set out in the seventh conclusion in the orders was sufficient to reflect that the issuing judge had made the determination required by subsection (c) paragraph (2). We need not decide whether the rationale relied on by the trial court will bear up under the strict compliance test. We think that the orders otherwise showed that the issuing judge determined that there was "probable cause for belief that particular communications concerning that offense will be obtained through the interception." Conclusions (1), (3), and (4) in the orders clearly reflect, as appellants concede, that the issuing judge made the determinations required by paragraphs (1), (3), and (4), respectively, of subsection (c), section 10-408 (18 U.S.C.A. § 2518 (3) (a) (c) and (d)).

The judge determined, as set out in conclusion (2) of the order, that there is probable cause for belief that "the facilities have been, are being, and will continue to be used by the suspects" for committing crimes proscribed by the

Controlled Dangerous Substances Laws, and that the interception and recording of specified conversations" is necessary and essential in order to gain evidence leading to the solution of these crimes, to the identity of other persons with whom the described persons are working and . . . to prevent the continuation of said crimes." *Ipso facto* he has determined, as required by the statutes, that "particular communications concerning that offense will be obtained by the interception."

This is no more than a common sense reading of the order conclusion (2), and the strict compliance standard is no wise violated by the application of common sense. Strict compliance can be demonstrated by other than the exact words of a statute. We hold that with respect to the directions of Courts Art. § 10-408 (c) and 18 U.S.C.A. § 2518 (3) for the issuance of an interception order, the orders here did not deviate from the dictates of the statutes.

Appellants also suggest that the orders are defective in that they do not contain specific factual findings on which the conclusions are based. Both the state and federal statutes provide that the determinations of the issuing judge are to be "on the basis of the facts submitted by the applicant." § 10-408 (c), § 2518 (3). Neither statute prescribes that the factual bases be set out in the order. See § 10-408 (d), § 2518 (4). Paragraph (7) of each order, as we have seen, was a general finding of probable cause for the issuance of the order and for the degree of intrusion. The facts and circumstances recited in the applications and affidavits, incorporated in the orders by reference, were sufficient to satisfy the issuing judge. Absent a statutory requirement or, in the circumstances, any logical need for such findings appearing in the order, we see no merit in appellant's contention.

## IV.

Appellants attack the Howard County order as "overbroad and unspecific." They allege that, contrary to the declaration

in paragraph (1) of the conclusionary part of the order,[5] there was no probable cause on the basis of facts shown by the applicant to support the determination that controlled dangerous substances were being manufactured, as distinguished from distributed and possessed. We do not agree. "Manufacture" is broadly defined by the Controlled Dangerous Substances Act and "includes any packaging or repackaging of [a controlled dangerous] substance or labeling or relabeling of its containers. . . ." Md. Code (1957, 1976 Repl. Vol.) Art. 27, § 277 (p). It was clear in the application and incorporated affidavit that from the quantity of the substances from time to time involved, the size of the buys made by the undercover agents, and the conversations had and overheard, a major supplier was concerned. There was ample probable cause for belief by the judge that a controlled dangerous substance was being "manufactured" or that there was a conspiracy to so "manufacture" as that word is defined by the statute. However, even assuming *arguendo,* that there were no facts sufficient to show probable cause for a belief that there was the manufacturing of a controlled dangerous substance, the operating portion of the order, setting out the specific orders, spoke only in terms of the distribution and conspiracy to distribute controlled dangerous substances.

Appellants also support their contention that the order was "overbroad and unspecific" by urging that the facts submitted showed that cocaine was the only controlled dangerous substance involved, and that the order did not adequately specify particular offenses. We think the references to controlled dangerous substances and to violations of the Controlled Dangerous Substances Laws with Maryland Code citations were sufficient. We agree with the trial judge that "the generic identification of controlled dangerous sub-

---

5. As set out *supra,* conclusion (1) was that the issuing judge found probable cause for belief that there were being committed violations of the Controlled Dangerous Substances Laws of Maryland "including the unlawful manufacturing, possession, distribution and conspiracy of Controlled Dangerous Substances violations of Article 27, Sections 276-302, of the Annotated Code of Maryland. . . ."

stances, rather than the more specific identification of cocaine" did not affect the validity of the order. The statutory requirements for the issuance of an interception order speak of "a particular offense enumerated in § 10-406 of this subtitle. . . ." § 10-408 (c) (1). The offenses enumerated in § 10-406 include "dealing in controlled dangerous substances, or any conspiracy to commit [that offense]." And the comparable federal provisions include in the designation of "a particular offense," § 2518 (3) (a), "dealing in narcotic drugs, marihuana or other dangerous drugs . . . or conspiracy to commit any of the foregoing offenses." § 2516 (1) (e) (g). "The Congress certainly indicated its intent that, within certain limits, state judges could broadly delineate the offenses for which they were granting authorization to tap. . . ." *State v. Mayes, supra,* 284 Md. at 635. *See United States v. Licavoli,* 604 F.2d 613 (9th Cir. 1979), *cert. denied,* 446 U.S. 935 (1980); *United States v. Steinberg,* 525 F.2d 1126 (2d Cir., 1975), *cert. denied,* 425 U.S. 971 (1976). We do not think those limits were exceeded here. We reject this contention of appellants.

Appellants present what appears to be a companion contention. They claim that the affidavits were "defective in that they failed to correctly specify the controlled dangerous substances with which the named parties are alleged to be involved." In the prior contention, the attack went to the probable cause to support the orders. As to this contention, the argument seems to be that the affidavits were too specific to justify the orders. Appellants urge that because the backbone of the affidavits concerned dealings in cocaine as the controlled dangerous substance, the affidavit should have requested an application for intercepting conversations relating to cocaine rather than to "controlled dangerous substances." For many of the reasons set out in disposing of the prior contention, it was not necessary, in light of the facts recounted in the affidavits that the applications and the orders be as restrictive as appellants would have them. *See State v. Nelson,* 46 Md. App. 104, 109, 415 A.2d 865 (1980), in which we found the police had shackled themselves by "an unnecessarily restrictive order." *See also United States v.*

*Tortorello,* 480 F.2d 764 (2d Cir.), *cert. denied,* 414 U.S. 866 (1973); *United States v. Armocida,* 515 F.2d 29 (3d Cir.), *cert. denied,* 423 U.S. 858 (1975). We think that the applications, affidavits, and orders were sufficiently specific with respect to the crimes alleged to satisfy the mandates of the governing statutes.

## V.

Appellants direct another salvo at the orders with the claim that they "are defective in that they are based on petitions and affidavits which do not provide a full and complete particular description of the type of communication sought to be intercepted. . . ." They look to the federal and State statutes, each of which require that the application for an interception order shall include "[a] full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including . . . a particular description of the type of communications sought to be intercepted. . . ." 18 U.S.C.A. § 2518 (1) (b) (iii), § 10-408 (a) (2) (iii). The statutes also require, in the precise words of the directive relating to an application, that each order authorizing any interception specify such a description, and, in addition, "a statement of the particular offense to which it relates." § 2518 (4) (c), § 10-408 (d) (iii). The orders here strictly complied with these dictates. They stated, with minor variations,

"that the type of communications sought to be intercepted are telephonic conversations, and shall be and the same hereby are particularly described as follows: conversations and communications of the above described subjects and those others as yet unknown involving violations of the Controlled Dangerous Substances Laws, violations of Article 27, Sections 276-302, of the Annotated Code of Maryland to and from telephone number (301) 465-2513; more specifically:

(1) The identity of all participants, particularly the higher-ups in this distribution and conspiracy to distribute Controlled Dangerous Substances;

(2) The degree of their participation in this distribution and conspiracy;

(3) The addresses and telephone numbers of all participants so that the location of any criminal activity with regards to this conspiracy and distribution of Controlled Dangerous Substances can be determined;

(4) All details as to the manner of shipment or movement of quantity of Controlled Dangerous Substances, source of these Controlled Dangerous Substances, methods of eluding law enforcement detection, and whether or not this is one in a series of similar criminal conspiracies for distribution of the Controlled Dangerous Substances;

(5) And other evidence necessary to the prosecution and conviction of the above named individuals. Upon the attainment of the above stated objective, even if prior to the termination of the Order, the interception and recording of conversations of the above described subjects will be terminated."

These specifics tracked the objectives of the wiretap set out in the application, which were in turn supported by a factual basis spread out in the affidavit. We agree with the lower court that the first four specifics "all relate to proper purposes and authorized objectives, distribution and conspiracy to distribute controlled dangerous substances. They list all aspects of proper reception. . . . All have proper, have limited provisions." Appellants obliquely argue that the fifth specific "relate[s] to all crime and is thus overly broad." The trial court applied the rationale of the maxim *ejusdem generis* and found that specific (5) related to the distribution

and conspiracy to distribute controlled dangerous sub-
stances. Whether that maxim or the broader maxim *noscitur
a sociis* be appropriate, we are in accord with the finding.
Considered in the frame of reference of the preceding
specifics, the application and the affidavit, it is manifest that
the fifth specific is limited to the crimes which are the sub-
ject of the first four specifics.

We hold that the applications and the orders described the
type of communications sought to be intercepted with the
particularity commanded by the statutes.

## VI.

The federal statute, § 2518 (5), and the State statute,
§ 10-408 (e), each prescribe that "[e]very order and
extension thereof shall contain a provision that the
authorization to intercept shall be executed as soon as prac-
ticable. . . ." The orders here contained that provision. Order
No. 1 was entered on 1 February 1980 (no time of day desig-
nated) and set the start of the authorization as 6 February
1980 at 9:00 a.m.[6] Order No. 2 was entered on 10 March 1980
at 1:52 p.m. and set the start of the authorization as 12
March 1980 at 9:00 a.m. Appellants assert that the orders
violated the "as soon as practicable" directives by the
interval permitted between entry of the order and execution
of the interception authorization.[7]

The orders designated the means of interception and the
equipment to be used. A physical wiretap connection was to
be placed from police located terminal appearances of a cer-
tain telephone number. Intercepted communications were to
be transmitted to a location convenient to the police by a
lease-line to which the physical wiretaps were attached.
Recordings of the intercepted telephonic communications

6. The first of February 1980 was a Friday. Thus, a weekend intervened
between the entry of the order and the start of the interception.

7. Order No. 3, extending Order No. 2, was not challenged below on this
ground, as it called for authorization to intercept to be executed immedi-
ately upon entry of the interception order.

were to be by current activated tape recorders attached to the terminals of the lease-line. A device known as a "Dialed Number Decoder" was to be used to ascertain outside telephone numbers called on the tapped telephones. It was imperative that all of this be accomplished with the utmost care and caution, for, as the order stated, if either prior or simultaneous notice of the authorization for electronic interception and recording be given to the [suspects], the purpose and objective of the investigation would be frustrated, the commission of the crimes would be affirmatively facilitated and the perpetrators would be insulated from detection. The success of the interception efforts was vital since "normal investigative procedures have been tried and failed, or reasonably appear unlikely to succeed if tried or to be too dangerous." Therefore, the means of interception were to be set up with the help of the telephone company, which was ordered to furnish the police "forthwith, all information, facilities and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that the [telephone company was] according to the person or persons whose communications are to be intercepted." The telephone company was to be compensated at the prevailing rates.

In light of all of this, it is manifest that as to both Order No. 1 (with the intervening weekend) and Order No. 2, the length of time between the entry of the respective orders and the execution of the interception authorizations was indeed in strict compliance with the "as soon as practicable" directives of the statutes.

## VII.

The federal law, § 2518 (5), and the State law, § 10-408 (e), share a dictate that every interception order and extension thereof "must terminate . . . in any event in thirty days." The pertinent dates with respect to the orders here are:

| | DATE ISSUED | DATE AUTHORIZA-TION TO INTERCEPT SHALL BE EXECUTED | DATE AUTHORIZA-TION TO INTERCEPT SHALL TERMINATE |
|---|---|---|---|
| Order No. 1 | 1 February 1980 | 6 February 1980 at 9:00 a.m. | 6 March 1980 at 11:59 p.m. |
| Order No. 2 | 10 March 1980 at 1:52 p.m. | 12 March 1980 at 9:00 a.m. | 10 April 1980 at 11:59 p.m. |
| Order No. 3 | 10 April 1980 at 12:48 p.m. | 10 April 1980 at 11:59 p.m. | 9 May 1980 at 11:59 p.m. |

Order No. 1 and Order No. 2 each terminated more than thirty days from the date they were issued but "in thirty days" from the date specified for the execution of the authorization to intercept. Order No. 3 was within the statutory prescription as to either beginning date.

Appellants would have the prescribed thirty days start to run from the date the orders were issued, rendering them invalid as not in compliance with the thirty day precondition. We do not accept that view. Immediately preceding the thirty day dictate is an alternative termination provision concerning the attainment of the authorized objectives, so that the entire condition reads that every order and extension thereof "must terminate upon attainment of the authorized objective, or in any event in thirty days." [8] Of course, the authorized objective usually can be attained only after the interception has begun. The interception must begin as soon as it is practicable to put the interception devices in operation. We find it clear that the legislative

8. Each order contained the alternate termination condition in these words: "[N]otwithstanding the authorization to intercept for a designated period contained in this authorization, such authorization shall terminate and the same is hereby terminated upon attainment of the objectives authorized herein. . . ."

Each statute, in addition to prescribing affirmatively that the termination conditions appear in every order, also expressly forbids that an order "authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, [or] in any event longer than thirty days." 18 U.S.C.A. § 2518 (5); Courts Art. 10-408 (e).

bodies intended that the thirty day period run from the beginning of the actual interception, not from the issuance of the order. If there be any doubt we need look no further than the explanation in the Senate report, U.S. Cong. and Adm. News (1968) 2192: "The period of authorized interception is intended to begin when the interception — in fact — begins and terminates when the interception — in fact — terminates."

## VIII.

### (1)

Appellants argue that the orders were not in strict compliance with Courts Art. § 10-408 (f):

> "Whenever an order authorizing interception is entered pursuant to this subtitle, the order shall require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. The reports shall be made at the intervals the judge requires." [9]

Questions relative to this sub-section were laid to rest in *State v. Baldwin, supra.* The Court held that the provisions of § 10-408 (f) constitute "a mandatory precondition for obtaining valid intercept authority...." 289 Md. at 643. Although the order must require that reports be made, it need not spell out the time intervals for reporting, provided the judge gives the monitoring agents instructions, in writing or otherwise, at the time the order was executed, or

---

**9.** The Maryland statute is more restrictive than the federal statute in this respect. 18 U.S.C.A. § 2518 (6) provides:

"Whenever an order authorizing interception is entered pursuant to this chapter ..., the order *may* require reports to be made to the judge who issued the order showing what progress had been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge *may* require." (emphasis added).

*See* State v. Baldwin, 289 Md. 636, 641-642, n. 1, 426 A.2d 916 (1981).

thereafter, designating the time period for the reports to be made. But, the Court declared that "[a] written directive independent of the wiretap order itself, given at the time the order is executed, is ... the preferable [even though not required] method of compliance with the statute. . . ." *Id.* at 644.

Each of the orders here, for compliance with § 10-408 (f), orders that the State's Attorney concerned

> "or his designee shall advise this Court of the progress of the interception process, and the current status of the investigation in writing on each Monday throughout the course of the interception process, and shall reasonably record the date, time, and general content of such progress reports."

The court below found that the question before him was whether the language of the order calling for reports "of the progress of the interception process and the current status of the investigation" had the same connotation as the language of the statute requiring reports "showing what progress has been made toward achievement of the authorized objective and the need for continued interception." He thought that the order demanded even more than the statute. He observed, "Certainly the current status of the investigation and progress of the interception process cover both of the requirements; that is, progress towards achieving the objective and need for continued interception." We had the language of the orders here before us in *Nye v. State, supra.* In an *obiter dictum* we expressed our conclusion that "a commonsense review of the language of the orders suggests that the police were being directed to apprise the issuing judge of the *progress* of the interception; *i.e.,* the progress toward the authorized objective." 49 Md. App. at 118 (emphasis in original). We still see it that way, and by this case elevate *Nye's* dictum to a holding. Appellants complain that the conclusion that the orders comply with the reporting mandates of the statute can be reached only by way of the substantial compliance rule. We do not agree. The orders complied with the statute in requiring reports to the

issuing judge, in writing, at designated intervals. Being apprised each Monday of "the progress of the interception process and the current status of the investigation" would permit the judge "to evaluate what progress [was] being made toward achievement of the authorized objectives and the need for continuing interception." *State v. Baldwin,* 289 Md. at 643. We think that the reporting requirements of the orders were in strict compliance with the reporting provisions of the Maryland statutes. As we have indicated, strict compliance does not compel that the precise words of the statute always be used.

### (2)

Appellants also attack the progress reports submitted. They allege that "[the reports] did not contain enough specific facts about the investigation aside from the interceptions to comply with the requirements that they show progress toward achievement of the authorized objective and continued need." And they complain that the reports "were not prepared by the principal prosecuting attorney, as required by Title III, Section 2516 (2)."

### (a)

We summarily dispose of the complaint about who prepared the reports. Although the issue was raised below by appellants in a pretrial memorandum of law, the transcript of the suppression hearing does not reflect that it was pursued, and so it was neither tried nor decided below. Md. Rule 1085. But, assuming *arguendo* that it is properly before us, it is utterly devoid of merit. It takes no keen analysis of the statutes to appreciate that neither of them has a requirement that the progress reports be prepared by "the principal prosecuting attorney." The section of the federal law cited by appellants, § 2516 (2), concerns only an application for an order, as does the companion provision in the State law, § 10-406. There was no violation of the statutes and no departure from the directions in the orders with respect to who prepared and signed the progress reports.

(b)

In regard to the alleged defect in the contents of the reports, as we have seen, § 10-408 (f) of the State law and § 2518 (6) of the federal law both provide that when progress reports are made they show "what progress has been made toward achievement of the authorized objective and the need for continued interception." The progress report requirements are to be read in connection with the directives, § 2518 (5) of the federal law and § 10-408 (e) of the State law, that interception must terminate at the earlier of attainment of the authorized objective or 30 days. Thus, the progress reports enable the issuing judge to determine whether the interception authorization should be terminated before the expiration of thirty days. Each of the orders specified the objectives authorized and dictated that authorization to intercept "shall terminate and the same is hereby terminated upon attainment of [them]."

The objectives set out were to ascertain:

"(1) the identity of all participants, particularly the higher-ups in this distribution and conspiracy to distribute Controlled Dangerous Substances, (2) the degree of their participation in this distribution and conspiracy, (3) the addresses and telephone numbers of all participants, so that the location of any criminal activity with regards to this conspiracy and distribution of Controlled Dangerous Substances can be determined, (4) all details as to the manner of shipment or movement of quantity of Controlled Dangerous Substances, source of these Controlled Dangerous Substances, methods of eluding law enforcement detection, and whether or not this is one in a series of similar criminal conspiracies for the distribution of the Controlled Dangerous Substances, and (5) other evidence necessary to the prosecution and conviction of the above named individuals [with respect to Controlled Dangerous Substances]."

68

The State has fairly summarized the contents of the progress reports:

"In Howard County, four progress reports were submitted to the court which clearly demonstrated the progress toward the achievement of these authorized objectives and the need for continued interception. The report dated February 11, 1980 detailed the first six days of operation and confirmed that drug conversations were occurring, although at that time, Sampson, the main target, did not have any cocaine on hand. The nature of the involvement of various other unidentified individuals had not yet been determined. The police believed that Sampson's sister was involved in the drug distribution. The report indicates that the investigation was in its elementary stages, and clearly implies that further interceptions were necessary to achieve the objectives. The second report on February 18, 1980 indicated that substantial progress was being made toward the identification of a source of supply, one of the major objectives of the investigation. The police were able to identify Douglas Monroe as the person referred to in the conversations as "Shorty" and that Monroe was a drug supplier. The report stated that additional investigation was being conducted with respect to Monroe to determine the nature of his participation with Sampson and to ascertain whether the police should attempt to obtain a wiretap on Monroe's phone. The report of February 25, 1980 indicates that Monroe apparently had a steady supply of CDS and wanted to distribute it to Sampson and other unknown persons. The police are attempting to identify the unknown persons dealing with Sampson. The final Howard County report dated March 3, 1980 stated that the tap had been terminated because the police believed they had achieved their objectives on that level and were applying for an *ex parte* order on Monroe's phone.

The first progress report in Anne Arundel County, dated March 17, 1980, stated that the identity of certain individuals intercepted had not yet been ascertained. According to the report, Monroe had spoken with a number of persons concerning drugs and attempts were being made to identify these individuals. Monroe's drug supplier had not been identified. However, the police followed Monroe to Virginia where he was supposed to receive some cocaine. The second report dated March 24, 1980 states that Monroe had become paranoid about the police and that he had possibly installed another telephone. More importantly, another individual, arriving from Florida on an airplane, was suspected of being Monroe's partner in the drug business. However, the nature of their relationship had not yet been determined. Most significant was the fact that Monroe had been in contact with his source but, because names had not been exchanged, the source remained unidentified. Further investigation disclosed that a known cocaine distributor was residing at a certain address in Virginia. The report dated March 31, 1980 revealed that Monroe was known to still be meeting with his drug outlets. The report stated that one Gerry Lecompte has surfaced as Monroe's possible drug supplier and that an additional investigation with respect to Lecompte would be made by attempting to secure a pen register on his phone. The final report dated April 7, 1980, indicates that, although much effort was expended to determine when Monroe had obtained his latest supply of cocaine, he apparently received it without detection by the police. According to the report, it was anticipated that Monroe would obtain another supply because the interception disclosed that he was attempting to collect money owed to him for drugs. The report stated that there was still a need to obtain additional information concerning Lecompte

in an effort to prove that he was Monroe's supplier. An extension order was signed on April 10, 1980, but before any progress reports were due, it was terminated on April 12, 1980."

With these progress reports, the issuing judges were able to reach a considered determination whether the authorized interception should be terminated. The reports contained factual data adequate to show what progress had been made toward achievement of the authorized objectives and the need for continued interception. In other words, the reports were sufficient to assure that the use of the interception order was judicially controlled and would continue no longer than necessary. On the basis of the reports, we believe the issuing judges did not abuse their discretion in permitting the interception authorizations to continue. We hold that the progress reports furnished no basis for the trial judge to grant the motions to suppress.

## IX.

We hold that the trial court did not err in denying appellants' motions to suppress the evidence, and its judgments entered are affirmed.

*Judgments affirmed.*
*Costs to be paid by appellants.*